# PENN OIL COMPANY

## vs.

## TRIANGLE PETROLEUM AND GASOLINE COMPANY.

*Sale of Gasoline—Demurrage for Cars—Time of Shipment—
Waiver—Refusal to Accept—Resale—Sight Draft—
Presentment—Trade Usage.*

A count of the declaration which states that defendant on a date named ordered four tank cars of gasoline from plaintiff, to be shipped from and to points named, for which defendant agreed to pay a named amount per gallon; that this gasoline was shipped defendant in cars rented for the purpose, and that defendant, while accepting and receiving it, permitted it to remain in the cars "for a long and unreasonable length of time," as a result of which plaintiff was damaged, and further stating the daily rental which plaintiff had to pay for the cars, states facts which, if true, warrant recovery.                    p. 565

A count stating that on a date named defendant ordered ten cars of gasoline to be shipped to it, for which it agreed to pay a price named per gallon and to unload the cars within forty-eight hours after their arrival; that the cars arrived in accordance with the order in good condition; that defendant was notified of their arrival, but without reasonable or just cause refused to accept the gasoline contained in six of them, in consequence of which plaintiff, as defendant's agent, after due notice to it, resold the gasoline at the highest market price, which was less than the contract price, in making which sale it incurred various expenses, and that because of defendant's refusal to accept the gasoline plaintiff was compelled to pay demurrage and storage charges to the railroad company, and a rental of five dollars per day after the fourth day from their arrival, states a cause of action.                    p. 565

A count stating that plaintiff contracted with defendant to ship to it "twenty cars of gasoline over twenty days," for which it was to pay a named price per gallon subject to tank-wagon

changes date of shipment; that it had shipped seventeen cars when defendant claimed that the cars had not been shipped in accordance with the agreement, but nevertheless agreed to accept them if plaintiff would draw a draft for each of them, which plaintiff did, but upon arrival of the cars defendant refused to accept them, and that consequently plaintiff as defendant's agent, after due notice to it, resold the gasoline in the seventeen cars at the highest market price, which was less than the contract price, incurring various items of expense in connection with the resale; that plaintiff was compelled to pay storage and demurrage charges to the railroad company, and also a rental of five dollars per day for the cars, and that because of defendant's breach of contract plaintiff lost the profits which it would have made on the other three cars of the twenty-car shipment, states a cause of action.                              p. 566

Where one purchases bulky freight, knowing that it is to be delivered to him in cars owned or rented for the purpose by the seller, and that such cars are, when unloaded, to be returned in order that they may be used in the delivery of other shipments, the contract of sale being silent as to the time of unloading, he impliedly and as part of the contract undertakes to unload the cars within a reasonable time after receiving notice of their arrival at their destination, and in case he fails so to do the vendor is entitled to recover the fair value of the use of the cars for the time during which it was deprived of their use by such unreasonable delay.                        pp. 569-571

The purchaser is not relieved from such liability by the fact that he did not know of the rental agreement under which the vendor rented the cars, the terms thereof not being material to the determination of the fair value of the use of the cars.  p. 572

Where merchandise is sold f. o. b. the purchaser's railway station, the mere fact that the contract provides for payment by sight draft does not involve an obligation on the purchaser to make payment on presentation of such draft, if before the arrival of the merchandise at that station.                  p. 573

A stipulation as to time is ordinarily of the essence of a commercial contract.                                    p. 574

A contract of sale having been completed by telegraph before a formal acknowledgment of the order was sent by the seller or a written requisition was sent by the purchaser, and the contract so completed containing no stipulation as to the time of shipment, a statement in such order in this regard, and a similar statement in the requisition, even though material in ascertaining the intention of the parties, could not be regarded as a part of the contract.                                    p. 575

Where the purchaser of merchandise had requested the shipper to forward drafts for the purchase price to a certain trust company in the place where such purchaser did business, that the drafts were in the hands of such company at the time of the arrival of the merchandise is evidence from which it may be inferred that they were presented for payment at that time.

p. 577

A finding that defendant, who had purchased ten carloads of gasoline from plaintiff, waived presentation of a draft for two of such carloads at the time of their arrival, *held* to be justified by evidence that such draft had been previously presented and dishonored, that three drafts for single carloads were unpaid, and that defendant had, before the arrival of the two carloads, telegraphed plaintiff that it would not pay demurrage on any of the cars held pending payment therefor.            p. 577

In an action by the vendor of gasoline against the vendee on account of the latter's refusal to accept the gasoline when shipped to him, *held* that plaintiff was entitled to recover the loss resulting from his resale of the gasoline at the point of destination at less than the contract price, there being no regular market therefor at that point, and the sale having been made to another concern with defendant's assent and assistance.   p. 578

A prayer asking an instruction that there was no evidence that defendant ever received notice from the railroad of the arrival of "said cars" was properly refused as failing to identify the cars referred to, there being numerous cars, arriving at different times, involved in the action.                 p. 578

Where a telegraphic offer having been made by plaintiff to defendant to furnish "forty cars (of gasoline) over forty days," defendant directed plaintiff to "ship twenty cars," the contract

was completed, and its terms could not thereafter be altered except by the mutual consent of the parties thereto.          p. 580

That the offer of a commodity, which was accepted, read "forty cars over forty days" does not necessarily mean a car each consecutive day for forty days, nor can such an intention be inferred from that language alone.          p. 580

Where an expression used in a contract has some peculiar or trade meaning different from its ordinary and literary meaning, such fact, if shown, should be submitted for the consideration of the jury to aid it in arriving at the meaning intended by the parties.          p. 580

Where an offer of a commodity read "forty cars over forty days," and the offer was accepted as to twenty cars, *held* that the seller was only obliged to ship the twenty cars in twenty days, without being bound as regards the number shipped on any one day.          p. 580

A requirement in the contract of sale of a commodity, that a carload should be shipped each day for a designated number of days, might be found to be waived by the purchaser, in view of evidence that, with knowledge that shipments had not been made at that rate, it directed the vendor to draw new drafts for each separate car and assured the latter that everything would be satisfactory.          p. 580

In an action against a purchaser of gasoline for damages on account of its refusal to accept and unload cars shipped to it in accordance with the contract of sale, the admission of testimony, the only effect of which was to show what were the usual rates allowed for the rental of similar cars in territory from which the cars were shipped, was not cause for reversal.          p. 581

On an issue as to the liability of defendant purchaser to plaintiff vendor for the rental of cars unreasonably detained by reason of defendant's failure to unload them, an officer of a company engaged in the same business as plaintiff cannot be asked whether he would charge such a rental, it not being permissible to show the existence of a general custom by proof of the custom, habits or conduct of an individual.          p. 581

*Decided June 17th, 1920.*

Appeal from the Superior Court of Baltimore City
(BOND, J.).

The cause was argued before BOYD, C. J., BRISCOE,
THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS and
OFFUTT, JJ.

*Edward Duffy* and *Watson E. Sherwood,* for the appellant.

*E. M. Sturtevant,* with whom were *W. C. Tall* and *Oliver
Y. Harris* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The judgment from which the appeal in this case was
taken was entered on a verdict in favor of the appellee, re-
turned by the Court, sitting as a jury in the Superior Court
of Baltimore City, in an action in assumpsit for the breach
of several contracts for the sale of gasoline to the appellant.

The appellant is a corporation, having its office and plant
at Roslyn, Virginia, near the City of Washington, and is
engaged in the business of distributing gasoline. In the
operation of its business it maintains a number of tank
wagons or filling stations in the City of Washington, and
also supplies gasoline to individuals and various public insti-
tutions and to departments of the United States Government.

The gasoline which the appellant so distributes is deliv-
ered to it at its Roslyn plant, and there stored until drawn
out for distribution.

The appellee is an Oklahoma corporation engaged at Tulsa,
Oklahoma, in the sale of petroleum products, including gaso
line. As the railroad companies do not furnish cars for the
shipment of gasoline, it is usually shipped in private tank
cars furnished by the shippers. The appellee owned no tank
cars, but rented such as were needed for the transportation
of the products sold by it.

On April 10, 1918, April 15, 1918, and May 3, 1918,
respectively, the appellee sold the appellant three lots of gas-

oline to be delivered at Roslyn, Virginia. Shortly after shipments under these contracts began, differences arose between the parties to them, as to the terms of the contracts of sale. The main points of difference were, the time at which shipments were to be made, and when payment was to be made for the gasoline shipped. In consequence of these differences, or for other reasons, there was a considerable delay on the part of the appellant in unloading some of the cars of gasoline shipped to it by the appellee; some it refused to accept or unload at all, and others were not even shipped because the appellant had refused to accept cars which had been shipped to it. As a result of this conduct on the part of the appellant, the appellee claimed that it suffered substantial loss in several ways. One was that, because of the appellant's unreasonable delay in unloading some of the cars, the appellee was required to pay more rent for them than would have been necessary had they been unloaded promptly; another was that when the appellant refused to accept and unload the cars shipped to it, the appellee was obliged to sell the gasoline contained in them at a loss, and was also subjected to the payment of demurrage and storage charges and expenses incident to such sale; and finally, that as the appellant had refused to accept a part of the gasoline shipped to it under one of the contracts, it thereby violated the contract and made any further shipments under it unnecessary, and became responsible for any loss which the appellee suffered because of such breach, which as to the cars not shipped consisted of the loss of certain profits which the appellee would have realized had the appellant taken the cars at the price agreed on.

The appellee demanded that the appellant reimburse it for these losses, and upon its refusal, this suit was brought.

The declaration contains four counts, to each of which the appellant (defendant below) demurred. The demurrer to the fourth count appears to have been abandoned, and the demurrers to each of the other counts were overruled, and the general issue plea filed by the defendant. The objections

urged to the declaration in the lower Court were not pressed here in the brief or the oral argument of counsel, and in disposing of them this Court deems it sufficient to say that no error was committed in overruling the demurrer to the declaration, and the respective counts thereof, because each contains a statement of facts which, if true, constitutes a valid cause of action, and nothing further is required.   Art. 75, Code Pub. Gen. Laws, Sec. 3.

In the first count it is stated that the defendant, on April 10th, 1918, ordered from the plaintiff four tank cars of gasoline to be shipped from Oklahoma to Roslyn, Virginia, for which the defendant agreed to pay 21½ cents per gallon, and that this gasoline was shipped the defendant in cars rented for the purpose, and that while it was received and accepted by the defendant, yet it permitted it to remain in the cars "for a long and unreasonable length of time," as a result of which the plaintiff was damaged.   It further stated that the plaintiff was required to pay $5.00 a day rental for these cars.   This count does not gratify the technical rules of pleading, but as a mere narrative of the complaint it states facts which, if true, warrant a recovery.

In the second count the plaintiff declares that, on April 15th, 1918, the defendant ordered ten cars of gasoline to be shipped from Oklahoma to Roslyn, Virginia, for which it agreed to pay 21½ cents per gallon, and to unload the cars within forty eight hours after their arrival at Roslyn; that the cars arrived in accordance with the terms of the order in good condition, and that the defendant was notified of their arrival, but it without reasonable or just cause refused to accept the gasoline contained in six of them, in consequence whereof the plaintiff, as the agent of the defendant, and after due notice to it, resold the gasoline contained in these cars at the highest market price, which was less than the contract price, and that in making this sale it incurred various expenses incident thereto.   It is further stated that because of the defendant's refusal to accept the gasoline the plaintiff was compelled to pay demurrage and storage charges to the

railroad company, and also a rental of five dollars per day for the use of the cars for each day they remained unloaded after the fourth day from the time of their arrival.

In the third count the plaintiff says that, on May 3rd, 1918, it contracted with the defendant to ship to it at Roslyn, Virginia, from Oklahoma, "twenty (20) cars of gasoline over twenty (20) days" for which it was to pay 21½ cents per gallon subject to tank wagon changes date of shipment, and that it had shipped seventeen of these cars when the defendant claimed that the cars had not been shipped in accordance with the agreement, but nevertheless agreed to accept them if the plaintiff would "draw a draft for each car," which proposal the plaintiff accepted, and drew the drafts accordingly, but upon arrival of the cars the defendant refused to accept them, although notified of their arrival, and that in consequence of this refusal the plaintiff, as defendant's agent, after due notice to it, resold the gasoline in the seventeen cars at the highest market price, which was less than the contract price, and incurred various items of expense incident to the resale, and was compelled to pay storage and demurrage charges to the railroad company and also a rental of five dollars per day for each day the cars remained unloaded after the fourth day of their arrival. It is also stated that because of the defendant's failure to carry out the contract, the plaintiff lost the profits it would otherwise have made on the remaining three cars of the twenty car shipment.

The claim set up in the fourth count was eliminated by the granting of the defendant's fifteenth prayer and is not before us on this appeal, and will not therefore be further noticed. The record contains four exceptions, three of which relate to the rulings on questions of evidence and one to the rulings on the prayers.

Since the right of the plaintiff to recover under the pleadings on the contract sued on is raised by the prayers it becomes necessary to ascertain from the record what evidence there was to support them.

PENN OIL CO. vs. TRIANGLE P. & G. CO.   567

Md.]                    Opinion of the Court.

The only question arising in connection with the "four car shipment" is whether, under the contract relating to them, the defendant was obliged to unload them within a reasonable time after their arrival, and in the event of its failure to do so whether the plaintiff was entitled to recover the equivalent of the rental value of such cars from the time the defendant permitted the gasoline to remain in them after it had a reasonable opportunity under all the circumstances of the case to unload them.   J. W. Sherwood, president of the Penn Oil Company, is also engaged in a similar business in Baltimore, Maryland, where he trades under the name of Sherwood Brothers.   The Penn Oil Company, it is stated, is a subsiduary to and owned by Sherwood Brothers, and both concerns appear to have offices in the Garrett building in Baltimore.   On March 28, 1918, the appellee opened the negotiations for the sale of gasoline by offering Sherwood Brothers at Baltimore ten to twenty cars at 21¾ cents.   On April 9th, the Penn Oil Company, apparently in connection with this offer, offered to pay 21 cents, whereupon the appellee, addressing Sherwood Brothers, telegraphed the appellant it could furnish four cars of gasoline delivered at Roslyn at 21¾ cents per gallon upon "thirty days trade acceptance net."   Later it reduced this price to 21½ cents and in reply to this offer, on April 11th, it received from the appellant a telegram reading in part "we accept four cars ship one each third day * * *" and on the same day the appellee, in acknowledging the order, stated that a car was to be shipped "every two or three days" and that the invoices with bills of lading attached were to go to the appellant's bank at Baltimore.   On April 17th, appellee received from the appellant a requisition directing it to "ship these four cars at once."   Three of these cars arrived at Roslyn on May 9th, and one on May 10th, and remained there until the 11th of June, when they were unloaded by the appellant.

Upon shipment of these cars, the appellee on April 12th drew four trade acceptances covering them and payable through the Merchants & Mechanics Bank of Baltimore.

These acceptances were at the instance of the appellant returned to the appellee with instructions to draw on it through the Arlington Trust Company, at Rosyln, Virginia. The appellee, after these four acceptances were returned, drew a single draft covering the four cars on the appellant through the Arlington Trust Company instead of a "trade acceptance," because the time for the "trade acceptance" had expired. In giving the numbers of these four cars the appellee sent the wrong number for one of them and about nineteen days later its attention was called to the error by the appellant, and the appellee on the following day notified appellant the cars would be released upon payment of the draft for the four cars.

The appellant offered two prayers, the twelfth and sixteenth, both of which were refused, based upon the theory that the evidence summarized was not sufficient to entitle the appellee to recover under the first count of the declaration. In passing upon the question thus raised, we cannot consider either the amount of the verdict or the weight of the testimony, but only whether, assuming it to be true, it was sufficient in law to warrant a finding in favor of the appellee under the first count for any amount at all. Upon a careful consideration of this testimony, we are of the opinion that if the appellee's contention that the appellant was bound to unload and release the cars within a reasonable time after it received them is sound, that there was evidence in the case legally sufficient to support it. The question of blame or fault depending, as it did, not only upon the weight to be given to the testimony of the witnesses, but also on the relative weight and effect to be given to the facts shown by this testimony, was peculiarly within the province of the jury or the Court sitting in the place of a jury. Inasmuch as the only damage sought to be recovered under this count was for car rental, and as that element runs through the other counts, we will now consider whether, as a matter of law, the consignee of merchandise shipped over a railroad in freight cars not owned by the railroad company is bound to unload and

release them within a reasonable time after their arrival at their destination, and whether in the event of his failure to do so the consignor is entitled to be paid the fair value of the use of such cars for the time he was deprived of such use because of such failure.

The right of a carrier by water to recover for loss suffered through the failure of a consignee to unload a vessel within a reasonable time after receiving notice of its arrival has been frequently recognized by the courts of this country. It is true that in England maritime demurrage has been held allowable only when the contract of carriage provided for it, and that the decisions there have been followed in several early cases in the United States. 22 *L. R. A.* 530, note. But the decided weight of authority appears to support the rule as stated in *Hutchinson on Carriers,* § 842 (3rd Ed.), that one chartering a vessel under a contract which is silent as to the time of unloading and discharge "contracts by implication that he will unload and discharge her within a reasonable time in view of all the existing facts and circumstances, ordinary and extraordinary, bearing upon that question at the time of her arrival and discharge." For the same reason, where the duty devolves upon the consignee of freight transported by rail to unload it, it also becomes his duty to "unload the goods within a reasonable time, and if he fails to do so the railroad company will be entitled as a matter of right, or in accordance with its published rules and regulations, to demand a reasonable compensation for the use of the cars, whether they belong to it or to another company." *Ibid.* § 859. Such a charge is for the "use and occupation of the cars" and the obstruction of the tracks. *Norfolk & W. R. Co.* v. *Adams, Clement & Co.,* 90 Va. 393, 22 L. R. A. 530. And its propriety is generally recognized.

Upon the same principles and for the same reasons, where one purchases bulky freight knowing that it is to be delivered to him in cars owned or rented for the purpose by the person selling the goods, and that such cars are, when unloaded, to be returned in order that they may be used in

the delivery of other shipments, and where the contract of sale is silent as to the time of unloading, he impliedly and as part of the contract undertakes to unload the cars within a reasonable time after receiving notice of their arrival at their destination. Any other rule would clearly be unfair and unjust. Such cars are valuable property, and are in constant demand, and the only return which the owners can receive on the capital invested in them is from renting them out in supplying this demand or in using them to transport their own products. Manifestly the consignee has no interest in them except the right to their use for the transportation of the merchandise they carry. That is the right and the only right secured under the contract of sale and delivery, and not the right to use them for storage purposes after they arrive at their destination. If he does, after the cars arrive at their destination, and after he could by the exercise of ordinary diligence have unloaded them, detain them, not as vehicles of transportation but as places of storage, he undertakes thereby, upon principles universally recognized under the common law, to compensate the owner of them for their use and occupation during such period of wrongful detention.

The appellee, however, contends that such compensation was not within the contemplation of the parties when the contract was made, but the cases cited in support of that contention do not so decide. What those cases decide is that, in the event of the breach of a contract, the only damages recoverable are such as are so clearly and naturally the result of the breach that the parties to the contract must have known when the contract was made that they might naturally occur. So in *Globe Refining Co.* v. *Landa, etc., Co.,* 190 U. S. 540, it was held that, in a contract for the purchase of oil, the vendor was not bound to know that the vendee would be obliged to send cars a long distance to get the oil, because it could have gotten the cars anywhere it pleased, and the fact that it sent them from one place rather than from another could not affect the vendor's liability under the contract,

when it had no control over the vendee's action. And the principle is further illustrated in the cases of *Webster* v. *Woolford,* 81 Md. 329, and *Winslow Elevator Co.* v. *Hoffman,* 107 Md. 621, in the first of which it was held that where the vendee in a contract for the sale of land sold his fertilizer business in order to raise money to pay for the land, that loss resulting from such sale was not recoverable in an action against the vendor for a breach of the contract; and in the *Winslow Case* it was held that, in an action for the breach of a contract to instal a passenger elevator in an office building, where it was alleged that the elevator when completed was so defective and unsafe that the plaintiff lost rent through tenants removing from the building in consequence thereof, that such loss could not reasonably have been said to have been in the minds of the parties as a natural result of a breach of the contract. These cases do not support the contention that one can deprive another of the use of his property and use such property for his own profit and purposes, without incurring any obligation to compensate the owner or the person entitled to the possession of such property for its use. In the cases cited the respective defendants had no control over the matters causing the loss. The oil company could not prescribe where the purchaser was to get the cars in which to transport the oil it had bought; the vendor in *Webster* v. *Woolford* could not prevent the vendee from selling his business if he chose to do so, nor could he know whether the vendee would lose or gain thereby; nor could the contractor prevent tenants from leaving the office building because they did not like the elevator he installed there. We are therefore of the opinion that the facts alleged in the declaration were sufficient, if true, to entitle the plaintiff to recover the fair value of the use of the tank cars for the period during which it was deprived of their use because of the defendant's failure to unload them within a reasonable time after it had been notified of their arrival at their destination, and that the evidence was legally sufficient to permit a recovery under that count.

It follows, therefore, that the defendant's twelfth and sixteenth prayers, which submit the proposition that there was no evidence in the case legally sufficient to permit a recovery under the first count of the declaration, were properly refused and, for the same reason, the defendant's tenth and eleventh prayers asserting the proposition that there was no evidence legally sufficient to permit a recovery at all under the declaration were properly refused.

Nor was there error in refusing the defendant's first prayer, which is based on the theory that appellee could not recover for the use and occupation of such cars unless it knew of the rental agreement under which the appellee rented them, because the terms under which the appellee secured the cars in which the gasoline was shipped were not material to the determination of the fair value of their use and occupation, and whether the appellant did or did not know of these terms was immaterial. The measure of the compensation to which the appellee was entitled for the wrongful detention of the cars was the fair and reasonable value of their use and occupation for the period during which they were wrongfully detained. Naturally the most satisfactory evidence of such value would be the rate at which similar cars could have been obtained at the point in the territory from which the oil was to be shipped.

The "ten car" contract, which is the subject matter of the second count, resulted from the correspondence by letter and telegraph between the appellant and the appellee. On the same day it received appellant's acceptance of the four cars of gasoline mentioned above, the appellee wired appellant it would "take on ten additional" at 21⅝ cents subject to prior sale, and on the following day, April 12th, appellee wired it would "reduce price to 21½ sight draft less one," to which the appellant, on April 15th, replied "we accept ten additional tanks." On April 16th, appellee sent its acknowledgment of the order, in which it stated that the sale was to "Penn Oil Company, c/o Sherwood Bros., Baltimore, Md.," that the cars were to be shipped "one car at once, one car

every third day" and were "to be unloaded within 48 hours
of arrival and return promptly by reverse route." On April
17th, appellant sent its requisition A-3 for these ten cars, in
which appellee was directed to "ship one tank every third
day, less one." These ten cars were shipped at the following
intervals: two on April 18th, one on April 20th, one on
April 23rd, one on April 30th, two on May 6th, one on
May 9th, one on May 13th, and one on May 15th. The first
four cars shipped arrived on or before May 15th, and were
accepted and paid for. Of the others one arrived May 21st,
one on May 24th, one on May 27th, one on May 31st, and
two on June 6th, one of which was shipped on May 13th
and the other on May 15th. As these cars were shipped the
appellee drew sight drafts on the appellant for the purchase
price of the gasoline. The drafts for the first four cars were
paid, and these cars were unloaded; the drafts for the re-
maining six cars were not paid, and the cars were in conse-
quence permitted to remain on the tracks loaded. The appel-
lant refused to pay these drafts, *first,* on the ground that the
gasoline was not shipped at the rate of a car every three
days, and *second,* that it was not bound to pay these drafts
until the gasoline had actually arrived, and in this latter posi-
tion they were, in our opinion, correct. The gasoline was
sold f. o. b. Roslyn, Virginia. If the transaction had been
for cash, manifestly payment for the cars could not have
been demanded until they arrived at Roslyn, and since this
transaction was substantially a cash transaction, there ap-
pears to be no sound reason for holding that the drafts for
the price of the gasoline sold were payable before the arrival
of the cars containing it. The terms were "sight draft less
one." and while there is a physical difference between pay-
ment by cash and payment by sight draft, the difference is
not sufficient to warrant making any distinction between the
time when a payment by cash should be made and when one
by sight draft should be made. *Lawder* v. *Mackie Grocery
Company,* 97 Md. 8. There is nothing in the contract itself
to indicate that payment was to be made as the cars were

shipped and not as they arrived.   Ordinarily things are paid
for as they are received, and there is nothing in this contract
showing a contrary intention.   The gasoline belonged to the
shipper until it reached Roslyn, the shipper paid the freight
to Roslyn, why then should it be assumed, in the absence of
any expression in the contract, that it was to be paid for not
only before it arrived but even before it was shipped, for
there is as much reason for holding that the purchase price
for the whole ten cars was due as soon as the contract was
signed as there is for holding that it was due as soon as they
were shipped.   We are therefore of the opinion that the
drafts for the shipments of gasoline were not due until the
gasoline covered by them had arrived at Roslyn, Virginia.

Coming then to the next reason assigned by the appellant
for its failure to pay for these cars, it may be said that ordi-
narily stipulations as to time in commercial contracts are of
the essence, and the reason for this is manifest.   Merchants
carry on business largely through credit.   The capital in-
vested is often small compared to the volume of business
transacted in a given period, and this results from the con-
stant movement of the merchandise in which they deal, the
capital invested continually "turning over."   As one lot of
merchandise goes out to supply the merchant's trade another
comes in to take its place.   Where the commodity is such
that, because of the margin of profit possible on its resale,
and the demand for it, it is held for a very short time by
the merchant, and is placed in receptacles for convenience in
distribution rather than storage, it becomes essential to the
existence of his business that the merchant be assured of a
steady constant and regular supply.   And if, as often hap-
pens, his storage capacity is limited, the time of the arrivals
of the invoices of the commodity in which he deals is of the
utmost importance.   It is for such reasons that time ordi-
narily is an essential element where it is stipulated in com-
mercial contracts.   *Bowes* v. *Shand,* 2 App. Cases, 455;
*Brantly on Contracts* 180; *Baker* v. *Borzone,* 48 Md. 474.

And where time is of the essence of the contract, then the parties to it are entitled to require a strict compliance with its terms in that regard. *Pomeroy on Contracts*, par. 401. "In the contracts of merchants the time of the shipment is the usual and convenient means of fixing the probable time of arrival with a view of providing funds to pay for the goods, or of fulfilling contracts with third persons." *Elliott on Conracts*, par. 1551. It therefore becomes essential to determine whether under the contract made out by the correspondence there was a definite stipulation as to the time of the shipment. The appellee on the same day it accepted the four car contract wired the appellant that it could "take on ten additional" but at an advanced price. It later in answer to a reply of the appellant wired Sherwood Brothers that "it would reduce the price to 21½ sight draft less one" and in reply to appellant's telegram "we accept ten additional tanks," replied "have booked Penn ten cars additional 21½ sight draft less one." This completed the telegraphic correspondence between the parties. On the succeeding day, April 16th, the appellee in its acknowledgment stated that the cars were to be shipped "one car at once, one car every third day," and, on the 17th of April, the appellant sent its requisition directing the appellee to "ship ten cars 58-60 at 21½ cents f. o. b. Roslyn, Virginia. Ship one car every third day less one per cent." If the statement contained in the acknowledgment and in the requisition were integral parts of the contract for the sale of these ten cars of gasoline, then the appellee was obliged to make the shipment at the rate of one car every three days. If these statements were not a part of the contract, then the contract contained no stipulation as to the time at which the cars were to be shipped. Inasmuch as the contract was completed before either the acknowledgment or the requisition was sent, its terms could not be varied by either of these statements or in any other way except by the consent of the parties, and while they may have been material in ascertaining the intention of the parties to the contract as to when the gasoline should be shipped,

it cannot be said, as a matter of law, that they formed a part of the contract which had already been completed before they were sent. And inasmuch as the contract itself contained no stipulation as to the time at which the appellee was bound to ship the cars, the appellant was bound to receive and pay for the cars of gasoline as they arrived, upon the presentation of the drafts covering them.

In view of this conclusion it becomes unnecessary to discuss the question as to whether the appellant waived its objection to the rate at which the cars were shipped.

The appellant further contends that, even if the cars were shipped in accordance with the terms of the contract, yet it is not chargeable with the delay in unloading them, because the drafts covering them were not presented when and as the several cars arrived.

An examination of the record discloses that the appellant received and paid for the first four of these cars.

For reasons already stated the appellant was quite within its rights in refusing to pay for the gasoline before it arrived, but it was obliged to pay for it as soon as it did arrive, and the loss for which recovery is sought did not result from the appellant's failure to pay the drafts before the arrival of the gasoline, but from its failure to pay them when the gasoline which they covered arrived. Drafts covering these ten cars were sent between April 29th and May 27th. They were all single drafts, except one of May 15th which covered two cars and was returned unpaid and protested. As has been stated, four of the remaining drafts were paid, two on May 6th, one on May 13th and one on May 15th. It may be conceded that, before the appellant could be held responsible for failure to pay these drafts upon the arrival of the cars which they covered, it was entitled to have them presented to it for payment, and as the prayers dealing with this phase of the case raise the question of the legal sufficiency of the evidence, it becomes necessary to examine it to ascertain whether it was legally sufficient to show either that the drafts had been presented for payment upon the arrival of the cars,

or that presentation had been waived. Under the instruction
of the appellant, these drafts were drawn through the Arling-
ton Trust Company and directed to "Penn Oil Company,
c/o of Arlington Trust Company, Roslyn, Virginia." No
other address was given, and on May the 14th the appellant
had written the appellee to forward drafts "to the Arlington
Trust Company of Roslyn, Virginia, and also all further
transactions of this nature." The place at which the drafts
were payable then was the Arlington Trust Company and it
is shown that it received them. If they were in the hands
of the company to which they were sent at the direction of
the appellee at the time the gasoline covered by them ar-
rived (and there is evidence that they were), whether they
were payable either before or at the time of such arrival, their
presence there at that time would be evidence from which it
could be inferred that they were presented for payment. The
draft covering two of the ten cars was undoubtedly not pre-
sented for payment at the time the cars of gasoline covered
by it arrived, since it had previously been presented and dis-
honored, and then no further drafts were sent covering this
gasoline. But it also appears that on June 2nd, before the
arrival of these cars, the appellant had telegraphed the appel-
lee as follows: "The very best thing you can do is to author-
ize Arlington Trust Company release drafts and we tender
them Federal Trade acceptance instead. This will imme-.
diately release cars and stop the enormous demurrage and
charges. We refuse to pay any of these charges whatever."
Since the cars could not have been released without paying
demurrage and storage, and since there were these unpaid
drafts on single cars, the appellee considered that it would
be useless to send further drafts. This evidence, if true,
would have been sufficient to support the inference that the
appellant waived the presentation of drafts covering these
two cars.

Whether under all the circumstances the appellant was
entitled to receive any other presentation of the drafts or
other demands of payment than was afforded by their pres-

ence in the bank to which it ordered them sent at the time of the arrival of the cars, and whether it waived the presentation of any further drafts on the last two cars of the ten car order, presented another question of law and fact to be determined by a jury under the instruction of the Court, and since the prayers dealing with this question only involved the right of the appellee to recover at all for the breach of this contract, they were properly refused.   But the appellant further contends that even if the appellee was entitled to recover in this case it could not recover for any loss resulting from the resale of the gasoline because there was no evidence of its market value at Roslyn, Virginia, and because it was not notified that the gasoline would be resold at its risk. Without stating in detail the testimony on these points it is sufficient to say that it appears that there was at that point no standard market for gasoline, that it could not be offered to advantage at public auction, and that the usual and proper course was to ask for bids from corporations and individuals in that territory who handled gasoline in quantities, and that in the sale of the gasoline shipped under the ten and twenty car contracts this course was followed with the knowledge of the appellant and with its assent and assistance.   It follows, therefore, that there was no error in refusing the appellant's seventh, eighth, thirteenth, seventeenth, twentieth and twenty-first prayers, nor was there any error in refusing the defendant's ninth prayer, because said prayer was too indefinite under the evidence to submit any legal proposition.   It asks the Court to say that there is no evidence showing the appellant received notice from the railroad of the arrival of "said cars at Roslyn."   The prayer is not submitted in connection with any other prayer and contains nothing to identify the cars to which it refers.

The twenty car contract was the result of certain correspondence by letter and by wire by the parties to this appeal. On April 26th, the appellee wired the appellant that it offered "forty cars over forty days" at 21½ per gallon.   In reply appellant offered 21 cents, which it raised to 21¼

cents per gallon, and on April 31st it wired appellee "We accept forty cars offered your telegram twenty-sixth," to which on May 2nd appellee replied, "Have booked twenty cars twenty one-half net cash arrival drafts," and on the same day sent an acknowledgment in which it was stated that shipments were to be at the rate of a car a day, "to begin immediately," and, on May 6th or 7th, appellee received from appellant a requisition to "Please ship 20 cars 56/58 gasoline all over 430 at 21½ cents. Net cash on arrival and inspection." One of the witnesses for the appellee testified that between May 3rd and 22nd seventeen of these cars were shipped. There is nothing in the record to show the respective dates on which each of these cars was shipped except for such inferences as may be drawn from this statement and the way bills, which indicate that one car was shipped on May 3rd, two on May 10th, five on May 11th, four on May thirteenth, three on May 15th, and two on May 17th. The cars arrived, however, in the following order: two on June 17th, two on June 18th, five on June 19th, one on June 20th, one on June 21st, three on June 23rd, one on June 24th, and two on June 26th. On May 22nd, appellee received a letter from appellant intimating that this order was to be started on the completion of the others, and inasmuch as the contract called for it to begin immediately, it at once stopped shipping. And on May 25th, after it had received the invoices, appellant complained that they showed twelve cars shipped in two days, but directed appellee to draw "new drafts arranging one for every car and everything will be satisfactory." New drafts were drawn, but the appellant refused to take the cars as they arrived, and they remained on the railroad tracks until they were eventually resold at less than the contract price. In the meantime charges for rental and demurrage accrued, which the appellant paid. The appellant, in its second, third, fourteenth and eighteenth prayers, asserts the propositions that under this evidence the appellee was not entitled to recover. From what has been said with reference to the "ten car" contract, if there was a

.definite contract to ship the gasoline at the rate of one car a day, the appellant was entitled to insist that the appellee should ship at that rate, and upon its refusal it could have rescinded the contract. But the contract did not so provide. The final contract was made with reference to the offer to furnish "forty cars over forty days." It is true it sent an acknowledgment stating that shipments would be at the rate of a car a day, but before this acknowledgment was received the appellant in its requisition directed appellee to "please ship twenty cars." The contract was completed by the offer and the acceptance, and its terms could not have been altered except by the mutual consent of the parties to it. It cannot be said as a conclusion of law that "forty cars over forty days" means "a car each consecutive day for forty days," nor from that language alone can it be inferred that the parties so intended. If the parties intended that, it was easy enough for them to have said so. If the expression has some peculiar or "trade" meaning different from its ordinary and literary meaning, that fact if shown should have been submitted for the consideration of the jury under the instruction of the Court to aid it in arriving at the meaning the parties intended the term to have. In this particular case, the forty cars were not taken but only twenty cars upon, apparently, the terms upon which the forty had been offered. If there was, therefore, any arrangement at all as to the time of shipment, it must have been that the twenty cars were to be shipped at the same rate as the forty cars. We are of the opinion, therefore, that the appellant was only obliged to ship twenty cars within twenty days.

But even if the contract had required the shipment of a car a day, there is evidence in the case from which it could have been inferred that the appellant waived that requirement when, knowing that the shipments had not been made at that rate, it directed the appellee to draw new drafts for each separate car and assured it that everything would be satisfactory. In view of this testimony it cannot be said that there was no evidence in the case under which the plaintiff

could recover under the third count of the declaration, and for the reasons stated the appellant's second, third, fourteenth and eighteenth prayers were properly refused.

There are three exceptions to the rulings of the Court on questions of evidence. The first and second exceptions relate to testimony concerning the allowance of five dollars a day for car rental. Whilst this testimony was not, technically speaking, proper in the form in which it was offered, its effect, nevertheless, was only to show what the usual rate allowed for the rental of similar cars in the territory from which the cars in question here were shipped was, and it is not apparent that any material injury resulted to the appellant from its admission. There was no reversible error in these rulings of the Court.

The third exception is to the ruling of the Court in refusing to allow a witness for the appellant to be asked: "Q. If there was no stipulation of any kind, that car rental would be required, would you exact car rental?" Obviously this question should not have been allowed. If the purpose of the appellant was to show the existence of a general custom, that purpose could not be accomplished by proof of the custom, habits or conduct of an individual.

For the reasons stated the judgment of the lower Court will be affirmed.

*Judgment affirmed, with costs.*