CHESTON L. ESHELMAN COMPANY
*v.* FRIEDBERG ET AL.

[No. 234, October Term, 1956.]

124

*Decided June 25, 1957.*

The cause was argued before COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Herbert M. Brune, Jr.,* for the appellant.

*Donald N. Rothman,* with whom were *Gordon, Feinblatt & Rothman* on the brief, for the appellees.

PRESCOTT, J., delivered the opinion of the Court.

The appellant sued appellees claiming damages for an al-

leged breach of contract by the appellees, and filed with its declaration a motion for summary judgment, and an affidavit. The appellees filed appropriate pleas to the declaration, an answer to the appellant's motion for summary judgment, a motion for summary judgment and an affidavit on their own behalf.

After a hearing before Judge Niles, both motions for summary judgment were denied, and the case then proceeded to trial before Judge Mason, sitting without a jury. After hearing the evidence, Judge Mason held that the appellees had not breached the contract, but were justified in cancelling it because the appellant had failed to make deliveries of the merchandise, which was the subject of the contract in accordance with its terms. Accordingly, the court entered judgment for the defendants-appellees for costs. The appellants here appeal from this judgment, and also from the denial of its motion for summary judgment.

The appellees are in the business of producing and selling by mail order throughout the United States a new form of grass known as "Zoysia Grass". It is shipped and planted in plug or sprig form, and grows to fully cover the area where planted. Appellees have only been in the business of growing and selling this grass for three years. The business is a highly seasonal one and the great bulk of their grass shipments are made in the spring of the year; in 1956, these shipments began on or about April 25th. In order to achieve satisfactory results with this type of grass, most of appellees' customers also order a "turf plugger" to go with the grass. This aids in planting the grass, and is sold at a nominal figure to anyone ordering grass. It is shipped to the customer a few days before shipment of the grass itself.

The appellees also own a corporation—Green Beauty Zoysia Company—which is in the same business, and whose purpose is to serve and service department store customers as opposed to individual mail order customers. The officers and stockholders of Green Beauty Zoysia Company are the same as the partners in Zoysia Farm Nurseries. The general manager of both companies is and was Mr. Stuart Armiger. He made single purchases for both companies,

deliveries for both companies were made to the same place, and Zoysia Farm Nurseries (hereinafter referred to as "Zoysia") was the only company ever invoiced for shipments of pluggers.

In the latter part of November, 1955, Zoysia designed and furnished Eshelman a sample of a turf plugger that they wished him to manufacture. Negotiations were carried on between Armiger and Eshelman with the result that on December 7, 1955, Zoysia ordered 8,000 turf pluggers in writing. This order later will be set forth in some detail, as it was the basis of their future contractual relations. About 66 pluggers were delivered during January, 1956.

In February, Armiger went to see Eshelman about placing another order for an additional 5,000 pluggers, since Zoysia's orders for grass had been arriving at an unexpectedly high rate. Armiger expressed concern at the slowness of deliveries to date, and was told that this was due to a fire at the Eshelman plant, which occurred on or about February 10th. However, Armiger was assured by Eshelman that the fire damage was under control and that he would be able to make deliveries in time if Armiger would favor him with additional orders. Discussions were had concerning price and as a result of these discussions, Zoysia received written notices from Eshelman dated February 17, 1956, and February 27, 1956, changing the price of the pluggers to $1.15 each, as required under the basic agreement of December 7, 1955.

In response to this last communication, Armiger wrote an order on February 28, 1956. It was for 5,000 turf pluggers at the price of $1.15 each. It provided "all other details of our agreement of December 5, 1955 will apply." This latter date was obviously incorrect, and the agreement referred to was the written agreement of December 7, 1955. In accordance with the terms of this order, delivery of the 5,000 pluggers ordered on February 28, 1956, was to have been completed within a month from February 28, 1956. The order was signed "Green Beauty Zoysia Company", but, as indicated by the lower Court, this is of no importance. Everyone concedes that Green Beauty Zoysia and Zoysia

Farm Nurseries consisted of the same personnel, were in the same business, accepted deliveries at the same place, and were represented, insofar as Mr. Eshelman is concerned, by the same person—Mr. Armiger. It should be noted that the letter of February 27 from Eshelman to Armiger regarding this particular order of 5,000 pluggers was addressed to Zoysia Farm Nurseries and not to Green Beauty Zoysia Company. Delivery of the 5,000 pluggers so ordered was not due until March 28, 1956, under the terms of this order.

Between the end of February and the middle of March, 1956, Armiger talked to Eshelman several times. They discussed first, the question of delivery schedules, and second, the ordering of an additional number of pluggers, since Armiger's volume was more than anticipated. Eshelman said that he would be able to deliver any additional order that Armiger might place. Nothing was said by Eshelman regarding change in price, and Armiger went to Florida about March 17, 1956, telling Eshelman he would be in touch with him when he returned.

On March 21, 1956, Armiger, while still in Florida, was called by his secretary in Baltimore who read to him, over the telephone, a letter from Eshelman dated March 19, 1956. It, too, will be repeated later as it formed an alleged important link in the negotiations. Armiger was confused by a portion of the letter and called Eshelman from Florida on that same day. The fact that this conversation took place is undisputed, and evidence shows it was of long duration.

There is an irreconcilable conflict between the testimony of Mr. Eshelman and that of Mr. Armiger as to what was said in this conversation. Eshelman testified that Armiger called him from Florida and stated he had received the proposal of March 19, and was interested in ordering another 10,000 pluggers; that Armiger objected to the new price, but agreed to it; that he mentioned a desire for a very rigid schedule of deliveries, but Eshelman told him that he would not be responsible for any unforeseen difficulties in the order; and that he would do the best he could to make deliveries at the rate of 2000 to 2500 per week, but that Armiger would have to take them even though past delivery date. Armiger

had quite a different version of the conversation. According to him, he first complained of the price increase, and Eshelman said it was necessary in order to meet the time schedule, as considerable overtime work would be required. After much further discussion concerning the price and the need for prompt delivery, Armiger finally said that if he gave Eshelman the order, it would only be on the condition that Eshelman deliver the 5,000 pluggers previously ordered plus the additional 10,000 at the rate of 2000 to 2500 per week, beginning March 26th, and Eshelman said that was all right, he would meet the schedule.

Armiger further testified that thereafter he called his office and dictated a letter dated March 22, 1956, (set forth later with the others, so that they may be considered conveniently together). Armiger contends, and the trial court found, that the "proposal" accepted in this letter was Eshelman's proposal in this telephone conversation, while Eshelman contends the proposal accepted was the one contained in his letter of March 19th.

We shall now set forth the pertinent parts of the letters referred to above, and the negotiations between the parties in chronological order.

"December 7th, 1955
"Dear Mr. Eshelman:

"This is to confirm our verbal order of December 5, 1955 for 8,000 turf pluggers.

"Turf pluggers are to be manufactured exactly per sample submitted * * *. Deliveries to begin before January 30, 1956 and to be completed by February 28, 1956, time being of the essence. * * *

"The price for this order of 8,000 is $1.00 each. * * * Until you have otherwise notified us in writing, you will manufacture future written orders from us at the same price and terms as are herein specified, delivery of such orders in quantity of 8,000 or less to be one month after order is placed with you, providing steel is available. * * *

"Very truly yours,"

This letter was signed by the appellees and it was formally accepted by the appellant. On January 23, 1956, Eshelman delivered two pluggers, and as of February 28 (all dates hereafter named being in 1956 unless otherwise specified), he had delivered 2576. On this date, Zoysia ordered an additional 5,000 under the same terms, excepting price, as those ordered on December 7, 1955. As of March 19, Eshelman had delivered 5581 pluggers. On that date, the appellant sent the appellees this letter:

"Dear Mr. Armiger:

"I tried to reach you today on the telephone and explain the following to you. In considering your next order for 10,000 pluggers, we have studied the situation and find that there will be considerable overtime needed to meet your deliveries * * *. Therefore our price will have to be $1.25 each.

"Delivery will be made in our truck, in quantities of 2,000 to 2,500 per truck load, one load per week approximately. Delivery charge: $25.00 per load. Acceptance of complete order, even though it has passed delivery date. * * *.

"Yours sincerely,

"THE CHESTON L. ESHELMAN COMPANY

Cheston L. Eshelman,

President"

Following this letter, there occurred the telephone conversation mentioned above between Eshelman and Armiger, who was in Florida, on March 21. On March 22, the appellees sent the following letter to the appellant:

"We hereby accept your proposal to furnish all labor and materials for the manufacture of 10,000 turf pluggers as per sample number 4 @ $1.25 each.

"This order plus previous order of 5,000 are to be

delivered in quantities of 2,000—2,500 each week commencing March 26, 1956.

"All terms and conditions of order of December 7, 1955 will apply.

"Very truly yours,

ZOYSIA FARM NURSERIES"

\* \* \*

In spite of this letter, Eshelman made no deliveries in the week of March 26 and had made none as late as Thursday of the following week, when on April 5 Armiger called Eshelman and cancelled the last order for 10,000 pluggers.

The trial court found that the contract between the parties with reference to the 10,000 order was entered into by the telephone conversation that occurred on March 21 and the final confirmatory letter thereof on March 22, and that Eshelman had made a material breach thereof by failure in deliveries that justified Armiger in canceling the contract.

The questions presented for our determination are:

I. Was it the function of the lower court, sitting as a jury, to determine what constituted the contract between the parties?

II. If so, was the lower court's finding that appellant's acceptance referred to appellant's oral proposal clearly erroneous on the evidence?

III. Was there any legal excuse for appellant's breach of the contract?

IV. Was the ruling by the trial court on the appellant's motion for a summary judgment correct?

I

The appellant contended that the contract between the parties for the 10,000 pluggers was an integrated one that consisted of the agreement of December, 1955, the letter (or alleged proposal) from Eshelman of March 19, and the letter from Armiger dated March 22; while the appellees maintain that the contract consisted of Armiger's letter of March 22 which accepted "your (Eshelman's) proposal" made by way

of the telephone message the day before, and that this letter of March 22 had no reference whatsoever to Eshelman's letter of March 19. Stated in a slightly different manner, the appellants claim that in Armiger's letter of March 22, wherein it is stated "(w)e hereby accept your proposal", Armiger referred to the alleged proposal contained in Eshelman's letter of March 19; while the appellees assert these words related to the proposal made by Eshelman the day before over the telephone. This, obviously, raised a question of fact as to what actually was the contract between the parties, which properly was determined by the court sitting as a jury. *Am. Tow'g Co. v. Baker-Whiteley Co.,* 111 Md. 504, 522, 75 A. 341; *Severin v. Green,* 166 Md. 305, 307, 170 A. 731.

It was no violation of the parol evidence rule to admit oral testimony as to which "proposal" was intended by the parties in Armiger's letter of March 22. It was relevant and material evidence to aid the court in correctly determining what was the contract. The parol evidence rule, briefly expressed, is that contemporaneous parol evidence is inadmissible to contradict or vary the terms of a valid written instrument. Here, there was no attempt to vary, contradict, add to or detract from a contract, but the inquiry was to ascertain what was the agreement. The parol evidence was clearly admissible to explain to what "proposal" Armiger's letter of March 22 referred. *Criss v. Withers,* 26 Md. 553, 569, 570; *Dronenburg v. Harris,* 108 Md. 597, 614, 71 A. 81; *Shoop v. Fidelity & D. Co.,* 124 Md. 130, 137, 91 A. 753; *Gorter, Law of Evidence,* 2nd Ed., 189, 190; *Williston on Contracts,* sec. 630; and cf. *Williston on Contracts,* sec. 613, and *Corbin on Contracts,* secs. 535, 536, 537.

II

The experienced court below had an opportunity to see, hear and scrutinize the witnesses, and he determined as a matter of fact that the contract between the parties consisted of Armiger's letter of March 22, which was supplemented by the other letters to which it referred; and that the words contained in the letter of March 22, "(w)e hereby accept

your proposal", referred to the telephone conversation between Armiger and Eshelman. We are requested to reverse this conclusion by finding that he was "clearly wrong". We are unable to do this, because, after a careful examination of the record and a close consideration of the surrounding circumstances, we have concluded that the trial court was correct.

Had the court below accepted the appellant's contention as stated above, rather than that of the appellees, it would not have placed him in any firmer legal position. His letter of March 19 set a price of $1.25 per plugger with deliveries of approximately 2,000 to 2,500 per week and contained this provision: *"Acceptance of complete order, even though it has passed delivery date."* Armiger's letter of March 22 concluded, "All terms and conditions of order of December 7, 1955 will apply." One of the terms of the order of December 7, 1955, was that time was to be of the essence. This reply of Armiger therefore altered the method of performance suggested by Eshelman in his letter of March 19. A reply to an offer which alters in any manner the suggested method of performance is not a true acceptance of the offer, but in reality is a conditional or qualified acceptance, which amounts to a counter-offer. *Envelope Co. v. Balto. Post Co.,* 163 Md. 596, 605, 163 A. 688; *Rest. Contracts,* sec. 60; *Williston on Contracts* (Rev. Ed.), sec. 77. Consequently, if Eshelman had accepted this counter-offer by performance, he would have created a contract that had the same terms and conditions as the contract found to have existed by the trial court.

## III

It will be noted that "time was of the essence" of the contract was specifically mentioned in the agreement between the parties. The appellant concedes it was in default in its deliveries when the contract was terminated by Armiger. When time is of the essence of a contract, it means that the performance by one party at the time, or within the period of time, specified in the contract is essential in order to enable him to require performance from the other party; it does not

mean merely that time is a material matter, but that it is so material that a strict compliance in this respect is necessary to the right to require counter-performance. *Penn Oil Co. v. Triangle P. and G. Co.,* 136 Md. 559, 575, 111 A. 482; *Phillips Co. v. Md. Broadcasting Co.,* 184 Md. 187, 193, 40 A. 2d 298; *Norrington v. Wright,* 115 U. S. 188, 203; *Williston on Contracts* (Rev. Ed.), sec. 846. With the concession by the appellant that it was in default in supplying the pluggers (as a matter of fact it had not completed delivery on the first 8,000 order on April 5) in accordance with the terms of the contract, there can be no doubt that Armiger was amply justified in canceling the order for 10,000 pluggers on April 5.

It is suggested by the appellant that *Rest. Contracts,* sec. 275, affords it some standing despite its failure in deliveries. This section states that certain circumstances are "influential" in determining the materiality of a failure to fully perform a promise. In answering this, it is only necessary to say that this section has no application where the parties to a contract have, by express terms contained therein, stated what shall be considered material, such as time being of the essence of the contract.

IV

The record does not disclose with certainty that this final question is properly before us for decision; but, if we assume without deciding that it is, it is obvious from what has been said above that a definite question of fact was involved in the dispute between the parties. Consequently, the ruling of Judge Niles on the appellant's motion for a summary judgment was correct. Maryland Rules, 610 a.

> *Order of November 27, 1956, affirmed. Judgment of February 13, 1957, affirmed with costs.*