## POST ET AL. *v.* GILLESPIE ET AL.

[No. 158, September Term, 1958.]

*Decided March 19, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ., and KEATING, J., Associate Judge of the Second Judicial Circuit, specially assigned.

*Philip B. Perlman,* with whom were *Ellis Lyons, Leonard S. Melrod* and *Jerrold V. Powers* on the brief, for appellants.

*LeRoy Pumphrey* and *Reuben Shiling,* with whom were *T. Van Clagett, Jr.,* and *Isaac Hecht* on the brief, for appellees.

HORNEY, J., delivered the opinion of the Court.

When the chancellor dismissed the amended bill of complaint filed in the Circuit Court for Prince George's County by Arthur L. Post (Post or the broker) and Ten Limited, Inc.,[1] against James B. Gillespie and others (the owners), Post and the corporation group appealed. The bill sought specific performance of an alleged contract for the sale of Hatton Point, a 600 acre tract of land on the Maryland side of the Potomac River south of the District of Columbia.

Most of the tract is owned by James B. Gillespie and his wife (Gillespie or the Gillespies), but a part of it is owned in common with Albert W. Howard and his wife (the Howards). Prior to 1956 the owners had subdivided a part of the property into two developments known as Swan Creek Club and Swan Lake Club. The use of the building lots in both were restricted by covenants running with the land.

In the early part of 1956,[2] Post learned that the owners were willing to sell and immediately began negotiations, which culminated in the paper writing presently referred to. Dur-

---

1. The record shows that some of the shareholders of Ten Limited, Inc., intended to form another corporation to purchase Hatton Point, but at the time the offer to sell was "accepted" the proposed new "corporation" had not been formed and never became a legal entity. Therefore, in this opinion, the proposed corporation is sometimes referred to as the "so-called" corporation or the corporation "group."

2. All dates hereinafter mentioned refer to the year "1956."

ing the course of the negotiations the Gillespies were told that the broker knew of certain wealthy persons who were interested in purchasing the property and that they would construct a boat basin, a golf course, an apartment club house and a number of homes on the property. The prospect of having the property developed in this manner, plus the agreement that all building lots would be sold with restrictions similar to those then binding the lots already sold in the "Swan" developments, induced the owners to drastically reduce the "per acre" asking price for a quick sale at $525,000. The Gillespies later agreed to also include their home in the property to be sold since it was contemplated that they would occupy one of the apartments in the club house to be constructed. The price of the whole was fixed at $550,000, on which it was agreed the broker would be paid a 10% commission.

Since the broker needed "an offer" signed by the owners as his authority to negotiate with the prospective purchasers he then had, the owners agreed to set forth the terms and conditions under which they would sell in a written agreement. This paper writing, which was prepared by the broker, was submitted to the owners on March 6. It was signed on the same day by the Gillespies and the broker, and by the Howards on March 7. The paper writing [3]—it is disputed whether it was an offer, an option or a contract—is the subject of this controversy.

The agreement recited that it was made "between"—[leaving a blank space]—"as the vendee" and the Howards and Gillespies "as vendor," and "Art. Post [r]ealtor," who was designated "as the agent." It also provided that "for and in consideration of * * * [$10,000], check in hand paid, receipt of which is hereby acknowledged, the [v]endee agrees to buy and the [v]endor agrees to sell for * * * [$550,000]" (emphasis added), the property described in the agreement, excluding certain lots in the "Swan" developments which

---

**3.** The paper writing, except when it is deliberately called an offer, option or contract, is usually hereinafter referred to, for the sake of brevity and to avoid possible confusion, as the "agreement."

had been previously sold. The agreement further provided that the purchaser should comply with the terms of sale within ninety days [from March 6] or as soon thereafter as title could be examined and the transfer papers prepared or the deposit would be forfeited. In the event of a forfeiture it was stipulated that the broker and the Gillespies would divide the down payment fifty-fifty. There were also numerous other contractual provisions which have no bearing on this controversy.

The broker was unsuccessful in inducing the original prospective purchasers to buy, but he continued his efforts to find other interested purchasers. According to Gillespie, when he called the broker at the end of March, he was told that the original prospects could not go through with the transaction, but that the $10,000 deposit was in escrow, whereupon Gillespie, stating that an escrow was not acceptable, demanded payment of the deposit into his hands. When payment was not forthcoming Gillespie called the broker again in the middle of April and told him "the deal was off."

During the latter part of March, the broker contacted one of the members of the so-called corporation and two of them inspected the property with the broker and were impressed with its development possibilities. A Washington attorney, the apparent spokesman for the corporation group, persuaded Post to participate in the purchase of the property by taking a 20% interest with the understanding that he was to still receive the whole of the commission for making the sale. It was agreed, however, that he would pay one-fifth of the down payment.

In the latter part of April the Washington attorney was authorized by the "board" to act for the corporation, and; anticipating purchase, the corporation group made an effort to have the owners execute another paper writing and modify some of the provisions the group did not like but the proposal was rejected. The group finally decided to buy under the terms and conditions set forth in the original agreement and on May 23 Post signed the agreement as vendee in the name of himself as "[s]ecretary of a [c]orporation to be formed."

An Alexandria [Virginia] attorney was designated by the group to act as escrow agent. He was furnished with a filled-in copy of the agreement and was given a check for $2000 by Post, and was mailed a check for $8000 by the corporation group, which latter check he never cashed. The purchasers instructed the escrow agent to hold the $10,000 in escrow, to order a title examination and to advise the owners of the purchase. The agent wrote the Gillespies forthwith that he had checks totaling $10,000 and that title examination was under way.

On the same day—May 23—Post dispatched an employee with the filled-in agreement and the letter written by the escrow agent to the Gillespies. On the next day—May 24— the Gillespies, through their attorney, notified the escrow agent that the agreement had not been complied with in that the $10,000 down payment had not been paid to them and that the purchase had not been approved by the board of governors of the "Swan" development clubs. The letter suggested that "immediate steps should be taken" to remedy the situation "since this contract is to expire on June 6th next."

Within a week or so after May 24, Post's employee again called on the Gillespies to discuss the disagreement between the parties. He was told that the owners did not wish to go through with the agreement because they did not like the names of the purchasers and because they had not received the $10,000 deposit. On June 12 the attorney for the owners wrote another letter to the escrow agent terminating the agreement since the conditions had "not been complied with." There were no other communications between the parties until August 3 when the Washington attorney wrote the owners stating that the title examination had been completed and fixed the date of settlement as August 21. The owners did not appear.

The chancellor found that the agreement constituted an offer to sell the property and that the payment of the $10,000 deposit into the hands of the owners was a condition precedent to the creation of a binding and enforceable contract. He also found that payment of the deposit to an escrow agent

was not an unqualified acceptance of the offer according to the terms thereof.

Post, on behalf of himself and the corporation group, contending that the chancellor was in error, claims that placing the deposit in escrow instead of paying it to the Gillespies did not prevent a contract of sale from coming into existence. He and they argue that the agreement did not require payment of the deposit into the hands of the Gillespies and that, even if it did, the acknowledgment of the receipt of the deposit by the owners as vendors precludes them from asserting the invalidity of the agreement. They further claim that there are no valid reasons why the agreement should not be specifically enforced against the owners. We cannot agree. Instead, we think, as did the chancellor, that the agreement was a continuing offer to sell which was not accepted according to the terms and conditions of the offer.

The only person who had an interest in the agreement other than the vendors was Post and he was specifically designated as the realtor and the agent of the owners as vendors. A contract is "an agreement which creates an obligation * * * and such an agreement may be defined as the concurrence of two or more persons in a common intent to affect their legal relations * * *." *Buffalo Steel Co. v. Kirwan,* 138 Md. 60, 64, 113 A. 628 (1921). A manifestation of mutual assent by the parties to a contract is essential to its formation. Restatement, *Contracts,* § 20 (1932). As was stated in *McElroy v. Seery,* 61 Md. 389, 397 (1884), in speaking of the requirements of a memorandum in order to satisfy the statute of frauds, "[i]t is essential * * * that the written memorandum should show who are the contracting persons. Not only who is the person to be charged, but also who is the person in whose favor he is charged, for it takes two to make a bargain."

For the same reasons, the agreement is not an *option.* An option is but a form of contract. It consists of an offer embraced in either a formal or an informal contract, which must usually be accepted within a specified period of time. See Restatement, *Contracts,* § 24. Therefore, an option too must have both a promisor and a promisee.

We have concluded that the agreement was an *offer* that would continue until it was accepted or rejected by a promisee or until it was revoked by the promisors. The real question then, is whether the "acceptance" of the offer by Post as "secretary of a corporation to be formed" and the payment of the deposit into the hands of an escrow agent created a binding and enforceable contract of sale between the owners as vendors and the vendee.

Even if we assume, without deciding, that the offer had not been revoked—the owners claim that it had been revoked —and that Post had a legal right to accept the offer on behalf of himself and others—the owners deny that he had such right—it is clear that Post and the corporation group are not entitled to specific performance.

The evidence shows that simultaneously with the conditional acceptance by Post, on May 23, of the written offer of March 6 on behalf of himself and the corporation group, he and they paid the deposit to an escrow agent selected only by them instead of paying it to the Gillespies in accordance with the offer. When this rejection of the original offer and the making of the counteroffer was communicated to the owners by the covering letter from the escrow agent in which he enclosed a copy of the fully executed paper writing, the owners, on May 24, promptly declined to accept the counteroffer. And, even though the owners, in declining to accept the counteroffer, indicated they would still go through with the deal if the deposit was paid to them forthwith, the purchasers either neglected or refused to comply, and the owners on June 12 revoked the original offer because the conditions —set forth in the letter of May 24—had "not been complied with."

We think there is no doubt that the legal effect of accepting the original offer of the owners as modified by the payment of the deposit into the hands of an escrow agent under a bipartite—instead of a tripartite—arrangement amounted to a partial rejection of the original offer and introduced into the bargaining a radically different counteroffer—with respect to the person who should hold the down payment pending final settlement—which the original offerers were unwilling

to accept. Obviously, under such circumstances, there was not an unqualified acceptance of the original offer. *Duplex Envelope Co. v. Baltimore Post Co.*, 163 Md. 596, 163 A. 688 (1933); Williston, *Contracts*, § 77 (3rd ed., 1957). See also *C. L. Eshelman Co. v. Friedberg*, 214 Md. 123, 133 A. 2d 68 (1957), [acceptance of an offer altering the method of performance is a conditional or qualified acceptance and amounts to a counteroffer]; *Ebline v. Campbell*, 209 Md. 584, 121 A. 2d 828 (1956), [a qualified or conditional acceptance is a counteroffer and rejects the original offer]; *Brillhart v. Beever*, 198 S. W. 973 (Tex. Civ. App., 1917), [acceptance varied from the offer and merely constituted a counterproposal]; Restatement, *Contracts*, § 38 [counteroffer relating to same matter is a rejection of original offer] and § 60 [reply to offer purporting to accept but adding qualifications is not an acceptance but a counteroffer].

Since payment of the deposit to the escrow agent instead of to the Gillespies did not constitute an unqualified acceptance by the purchasers of the original offer, there was no binding contract to be enforced. Therefore, the argument by the purchasers—to the effect that the recital of the receipt of the deposit or down payment precluded the owners from claiming that the agreement is invalid—is without merit. This is so because the qualified acceptance did not transform the theretofore unaccepted *offer* into an integrated *contract*. Stated otherwise, the acceptance of the offer coupled with the modification of its terms could not and did not constitute a final and complete expression of the agreement between the parties. See Restatement, *Contracts*, § 228. Consequently, § 243 of the Restatement, and the cases cited by the purchasers, on which they rely to support their position, are not in point here.

Having arrived at the conclusion that the remedy of specific performance is not available for the reasons hereinbefore stated, it is not necessary for us to consider the other questions raised by the parties.

The decree must be affirmed.

*Decree affirmed, the costs to be paid by the appellants.*