## INSTITUTIONAL MANAGEMENT CORPORATION

v.

## TRANSLATION SYSTEMS, INC., et al.

### Civ. No. Y–78–611.

United States District Court,
D. Maryland.

July 7, 1978.

---

Howard Richard, Media, Pa., William W. Cahill, Jr., Baltimore, Md., for plaintiff.

James W. Nowak, Silver Spring, Md., for defendants.

JOSEPH H. YOUNG, District Judge.

Plaintiff Institutional Management Corp. (IMCO) complains that in February, 1978, defendants Translation Systems, Inc. (TSI), and D. Michael Banz, Donald H. Nixon and Lionel J. Bartram, individually and in their official capacities as members of TSI, wrongfully removed property and equipment, owned by plaintiff, from plaintiff's place of business in Gaithersburg, Maryland. The property consists of materials, equipment and documentation, which are part of or related to a computerized system for reading stenotype tapes and translating them directly into English text. (Hereinafter this property will be referred to as the "system.")

Plaintiff asks that a writ of replevin be issued for return of the property and that defendants be enjoined from utilizing or conveying to others knowledge of the system, which they acquired in the course of their employment with plaintiff.

While it is undisputed that certain items were removed from the Gaithersburg premises, the nature and extent of such property is in dispute. More fundamentally, the defendants contend that the property belongs to a joint venture, entered into by Nixon, Banz and Morton Sturm, president and sole stockholder of IMCO, for the purpose of developing and marketing a system. Defendants further contend that an action for replevin will not lie against joint adventurers.

For the reasons to be stated herein, plaintiff is the owner of the system, and the writ

of replevin will issue. Injunctive relief to protect plaintiff's ownership interest will also be ordered. All findings of fact and conclusions of law are made in accordance with Rule 52(a) F.R.Civ.P., whether or not specifically stated.

## I. BACKGROUND.

While the nature of the relationships among IMCO, and its president Sturm, and Nixon, Banz, and Bartram is a basic issue in dispute in this suit, it is agreed that some business relationship did exist, and that all participated to some extent in the stenotype project.[1]

The initial business relationship arose in 1974 between IMCO and Nixon, who, at the time, was president and chief stockholder of Computer Information Systems Co., Inc. (CISCO). At this point, the project was only in the "idea" stage. Nixon and Sturm were acquainted through previous business transactions between their companies, the subject matter of which is unrelated to the present suit.

The system involves use of an optical scanner to "read" the stenotype tapes, and requires a dictionary which a computer compares against the stenotype input and translates into English text. Banz, a specialist in the field of optical character recognition, became involved in the project to meet the need for an optical scanner and paper transport. Nixon worked on the dictionary aspect of the system and development of computer software. Sturm, through IMCO, provided financial resources, and participated in the project in a non-technical capacity, which was to include marketing the product at the appropriate time.[2]

In early 1976, it was learned that a dictionary had previously been developed by the Central Intelligence Agency and released to the public domain. The CIA dictionary was acquired for the system, but could not be utilized effectively, since a key element, known as an algorithm, had been deleted from the program before it was released to the public domain. Bartram became involved at this point for the purpose of solving the algorithm problem, and subsequently provided additional programming services. Bartram was a free-lance programmer when he first began working on the system. After he jointed Cutler Computer Concepts, Inc., he continued work on the project under an agreement whereby IMCO paid Cutler for his services.

The system was never marketed during the above time period. No benefits from its commercial use had accrued when Banz, Nixon and Bartram terminated their relationship with IMCO in February, 1978 and formed TSI. By that time, an engineering prototype and two production models existed.[3] The testimony is in conflict as to the readiness of the system for widespread production. However, the evidence showed that the project was making the transition from a "developmental" to a "commercial" stage, and at least one customer had been found for its services.

## II. REPLEVIN CANNOT BE MAINTAINED BY ONE JOINT ADVENTURER AGAINST ANOTHER.

A joint venture is an association of two or more persons to carry out a single business enterprise for profit, and is also called a partnership for a single transaction, e. g., *Hobdey v. Wilkinson,* 201 Md. 517, 94 A.2d 625 (1953); *Southern Can Co. v. Sayler,* 152 Md. 303, 136 A. 624 (1927); J. Mullen, *Joint Adventurers,* 8 Md.Law Review (1943). A joint venture is indistinguishable from a partnership for all important purposes; differences, when they do exist, are of a "technical character." *Madison National Bank v. Newrath,* 261 Md. 321, 328, 275 A.2d 495 (1971).

---

1. Translation Systems, Inc. was only formed this year, and its existence is not relevant to the issue of determining the past business relationships of the other parties.

2. As stated above, the proper characterization of Sturm's role is precisely the matter in dis-

pute. However, it is agreed that Sturm did not contribute the technical skills or expertise to develop the system.

3. The second model may not have been completed.

The action of replevin does not lie among partners, *Anderson v. Stewart,* 108 Md. 340, 70 A. 228 (1908). In that case, the court stated:

> The possession of one partner is the possession of all; and it is this principle which forbids that *one partner or tenant in common,* should maintain replevin against another.

*Id.* at 349, 70 A. at 231, emphasis added.

Joint adventurers hold real estate as tenants in common, and the holder of the legal title is a trustee for his coadventurers, who must deal with the property in accordance with the standards required of the trustee of an express trust. 48 *Corpus Juris Secundum* 834. Maryland recognizes such resulting trusts. *Byer v. Szandrowski,* 160 Md. 212, 153 A. 49 (1931); *Dixon v. Dixon,* 123 Md. 44, 90 A. 846 (1914). Purchases of personal property are governed by analogous principles. One adventurer cannot exclude his associates from an interest in property by purchasing for his individual account, unless the agreement of the adventurers expressly allows such purchases. A member who acquires property in breach of this obligation can be required to convey an interest to the others upon payment by them, and to account for profits on property he has resold.

In view of these principles of ownership of joint venture property, replevin is no more appropriate than among partners. The considerations expressed in *Anderson v. Stewart, supra,* are equally applicable to property held in common. Therefore, if plaintiff and defendants had an agreement as joint adventurers, the writ of replevin must be denied.

## III. THE EVIDENCE DOES NOT ESTABLISH THE EXISTENCE OF A JOINT VENTURE AGREEMENT.

Joint adventures never arise by operation of law, but must arise from a form of contract. *E. g., Powers v. State,* 178 Md. 23, 29, 11 A.2d 909 (1940); *Joint Adventurers, supra,* at 27. The agreement may be express or implied, and need not necessarily be in writing.

In the instant case, lacking an express, written agreement, it must be determined whether one is implied by the course of conduct among the parties, including writings and business arrangements.

The concept of an implied agreement to enter a joint venture is illustrated in *Dolan v. Dolan,* 107 Conn. 342, 140 A. 745 (1928), which is cited with approval by the Maryland Court of Appeals in *Powers v. State, supra.* In *Dolan,* a wife refused to recognize her husband's rights in property which she had purchased with money saved from a fund to which both had contributed. The court found a joint venture, stating:

> In the present case, the facts disclosed strongly indicate that each originally understood that they were engaging in a joint enterprise, but they had no understanding as to the sharing of the results of their joint action. . . .
>
> Here was a joint fund in the hands of the defendant wife, placed there with the mutual understanding that she was to handle it for their mutual advantage, the first requirement being that she pay the family obligations, and there was no express understanding or agreement beyond this. In a joint adventure it is not necessary that there be an express agreement, for the conduct of the parties and other circumstances will often justify the inference that such an agreement existed; and the contract is not avoided for indefiniteness because the minor details are not fully established.

140 A. at 748.

While a joint venture can be established even when the members have not formulated their status in full detail, their conduct must show that they intended to act as joint adventurers, rather than in some other form of business arrangement. The determination of the relationships among Sturm, Banz, Bartram and Nixon involves two basic questions:

A. Does their conduct during the developmental phase of the system support an inference that they had agreed to be joint venturers, or is the

conduct more consistent with an employment or independent contractor arrangement?

B. Whether or not they were joint adventurers during the development phase, does the evidence show that they had reached an agreement, not reduced to writing, to function as joint venturers once the system was put to commercial use?

## A. NO JOINT ADVENTURER AGREEMENT EXISTED DURING THE DEVELOPMENT PHASE.

The criteria for distinguishing between an employee and an independent contractor are set forth in *Keitz v. National Paving and Contracting Co.*, 214 Md. 479, 134 A.2d 296 (1957), where the court stated:

> . . . there are at least five *criteria* that may be considered in determining the question whether the relationship of master and servant exists. These are: (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is a part of the regular business of the employer. Standing alone, none of these *indicia*, excepting (4), seems controlling in the determination as to whether such relationship exists. The decisive test in determining whether the relation of master and servant exists is whether the employer has the *right to control and direct the servant in the performance of his work and in the manner in which the work is to be done.* It will be noted from the above, it is not the manner in which the alleged master actually exercised his authority to control and direct the action of the servant which controls, but it is his *right* to do so that is important.

214 Md. at 491, 134 A.2d at 301, emphasis in original. *See* also *Charles Freeland and Sons, Inc. v. Couplin*, 211 Md. 160, 126 A.2d 606 (1956).

▋ A finding that a defendant was an employee of IMCO would indicate that he is not a joint venturer. However, even an independent contractor is not usually a joint adventurer. This point is well made in *Atlas Realty Co. v. Galt*, 153 Md. 586, 139 A. 285 (1927). A realty company was induced by one Miller, a builder who at times speculated in real estate, to purchase land, which it improved by building garages. The company then employed Miller in the sale of the property, and agreed to pay him half the net profit from each sale. The court found no joint venture, stating:

> In a sense they were engaged in a joint adventure, because each of them expected to profit through the sale of the same property, but in that sense nearly every principal and agent where a sale of real estate is sold by the agent are engaged in a joint adventure. But, something more than mere profit sharing is required to establish the fact that both were engaged in a joint adventure, in the technical legal sense of that phrase.

*Id.* at 589–90, 139 A. at 286.

▋ While the presence of a profit motive is a pre-condition of a joint venture, the case law strongly emphasizes that profit sharing alone does not make a business arrangement a joint venture. *E. g., Warren v. Dorsey Enterprises, Inc.*, 234 Md. 574, 578, 200 A.2d 76 (1964). As pointed out in *Chisholm v. Gilmer*, 81 F.2d 120, 124 (4th Cir. 1936), many forms of business involve profit sharing and mutual benefit, but in a joint venture:

> two or more persons combine in joint business enterprise for their mutual benefit, with an express or implied understanding or agreement that they are to share in the profits or losses of the enterprise, and that each is to have a voice in its control and management.

81 F.2d at 124.

It is the sharing of losses, not profits alone, which is the critical indicator of joint venturer status, *Brenner v. Plitt*, 182 Md. 348, 34 A.2d 853 (1943); *Powers v. State, supra.* In finding that the contractor in *Atlas Realty Co., supra*, was not in a joint venture with the realtor, the court stated:

. . . Miller had no interest of any kind either in the land or the garages. He was employed to sell them, but he had no authority to fix the selling price, or the terms of sale; he was liable for no losses, and he ran no risk, and, so far as he was concerned, there was neither venture nor risk. If a profit was realized, he was to share in it. If a loss resulted the Atlas Company alone was to bear it.

153 Md. at 590, 139 A. at 287.

In *Hobdey v. Wilkinson,* 201 Md. 517, 94 A.2d 625 (1953), a general contractor and landowners were found to be engaged in a joint adventure, since losses as well as profits were to be shared equally, and the contractor had great authority to conduct aspects of the business other than the construction tasks, including setting terms and conditions of sales.

The joint venture issue has arisen in other contexts before other courts. In *United States Fidelity & Guaranty Co. v. American Surety Co.,* 25 F.Supp. 280 (M.D.Pa.1938), the surety argued that the construction supervisor could not recover his costs under a construction payment bond because he was a joint adventurer with the general contractor. Concluding that the supervisor was not a joint adventurer, the court stated:

> It is true that the Plaintiff was to receive a share in the profits but this is not controlling. Even so, the share in the profits was not in the nature of an interest in the benefits of a business in which the Plaintiff was a co-owner, but was more nearly in the nature of additional compensation for the supplying of labor and materials. There must be some further manifestation of an embarking upon an undertaking for joint benefit and this additional indication is not present. . . The Plaintiff carried out all his transactions, labelled his bank account, and connected himself with the construction work as superintendent and was under the regular and frequent supervision of the Towanda Lumber Company. The payments on the contract between the United States Fidelity and Guaranty Company and the Towanda Lumber Com-

pany did not go into any account available to the Plaintiff but were sent to the Towanda Lumber Company, from whom the Plaintiff received the money to be used on the construction work. Throughout the entire transaction there is nothing to show that he was anything other than a salaried employee.

25 F.Supp. at 282–83. Comparing the facts with those in *United States v. United States Fidelity & Guaranty Co.,* 4 F.Supp. 854 (D.Wyo.1933), where a similar issue was resolved differently, the court stated:

> . . . there were additional factors evidencing an intention to engage in a joint undertaking which do not appear in the case under consideration. The Plaintiff and the general contractor, in the *Walker* case, established a joint account wherein the funds of both parties were mingled and checks in payment of the project were deposited. From this joint account all payments for labor and materials were made by checks drawn indiscriminately by either of the parties. Even the premium of the bond was paid from this account. Further, the account was significantly labelled "this is a joint partnership account for the purpose of transacting business together in connection with road contracts which we have taken jointly." With this clear indication of how the parties regarded the transaction, it is not difficult to understand how the Court arrived at its conclusion that the parties were joint adventurers.

25 F.Supp. at 282.

■ Analyzing the facts of the instant case in the light of the above principles, neither Banz, Nixon nor Bartram functioned as a joint adventurer with Sturm or IMCO during the development of the system.

Defendants do not appear to contend that Bartram was a joint venturer. The evidence establishes that he became associated with the project after considerable development had already occurred for the purpose of solving a particular problem. He bargained for and received set amounts for performing certain tasks. After Bartram

began working for Cutler Computer Concepts, Inc., IMCO paid his employer for the use of his time. There is no evidence that Bartram was a partner in the venture.

Although Banz and Nixon had more extensive roles, the manner in which they functioned is more characteristic of employee or independent contractor relationships than joint venturer status.

IMCO provided all funding, and more importantly, maintained financial arrangements which gave Banz and Nixon no direct access to the funds. IMCO remained ultimately responsible for payments. Nixon and Banz were reimbursed for all expenditures. No joint account was ever established and no funds were commingled,— quite different from the case where the member making the financial contribution places it in a joint account to which others have access. The difference precisely is the difference between IMCO retaining the ultimate right to control performance and IMCO contributing its resources to the joint control characteristic of a joint venture.

■ Defendants argue that they and Sturm were a "partnership" of know-how and capital, and that they were as necessary to Sturm as he to them, since no product would have resulted without their technical expertise. However, such mutual necessity is not the test for a joint adventure. The merger of capital and skills from separate sources is invariably necessary in all forms of business, and does not serve to distinguish one from another. It is the *way* the elements are brought together, not the *fact* that they are brought together which constitutes one form of business relationship, rather than another. In the instant case, the "way" is not marked by any of the features which establish joint adventure.

The premises in Gaithersburg were first leased and later owned by IMCO. Bills were sent directly, or indirectly to IMCO for payment. IMCO paid for "Steno-scribe" purchases. Steno-scribe had no separate bank account.

Documentary and testimonial evidence shows both Banz and Nixon negotiated for

payments. Banz was paid an agreed-upon figure for specific services, and later was paid on a periodic basis. Nixon's first agreement with Sturm was the aforementioned agreement between their companies, CISCO and IMCO. When CISCO ceased to operate, different arrangements resulted. During the greater part of the project period, Nixon was paid a periodic rate, which was approximately $1,000.00 monthly for half-time work, and was raised to $2,000.00 when he had full-time status. Significantly, the payments were consistent with their rates of pay for other jobs held previously and contemporaneously. In short, the payment arrangements indicate employee, or possibly independent contractor status, but not a joint venture.

There was considerable testimony that Banz and Nixon chose to work as they did because of heavy financial pressures produced by other unsuccessful business activities. The implication seems to be that the relationship among the three would have looked more like a partnership, if financial conditions had been different. This may or may not be true. However, the kind of arrangements which Banz and Nixon might or might not have made if the situation were different does not alter the relationship their conduct established.

■ Banz and Nixon did exercise great flexibility in choosing the means to perform their jobs. However, Sturm had the right of control. As stated above, the absence of close supervision is not the key issue. Particularly where work is of a highly specialized nature, close oversight is meaningless, and its absence is not significant in determining the business relationship of the parties. *See Charles Freeland and Sons, Inc. v. Couplin, supra.*

Further, the evidence showed that Banz participated only in the area of his expertise, rather than in the overall conduct of the business. Nixon had a broader range of activity, and was associated with the project from a very early point. Weighing these factors as possible indicators of joint venture status, they are overborne by the other circumstances enumerated. It is

worth noting that the change in the way the parties related to one another showed a drift toward employer-employee relationship rather than toward joint adventure. For example, in late 1977 Nixon asked IMCO to give him the benefit of its hospitalization plan, and withhold taxes on money paid to him.

The evidence also showed a method of relating which primarily, if not exclusively, involved direct lines of communication between Sturm and each other individual, rather than among all of them. The fact that Nixon and Banz each ultimately turned to Sturm to get what was wanted is an indicator of his ultimate authority.

Finally, a crucial missing element for proving a joint venture agreement is the absence of financial risk-taking by Banz and Nixon. Defendants' testimony establishes that they were to share profits, not losses. Banz and Nixon stated that a share in the profits was contemplated only after Sturm had recovered the money spent to develop the system. The distinction between sharing profits only, and sharing both profits and losses, is critical under Maryland law. A finding of joint venture may well be impossible where losses are not shared, and is impossible under the facts of this case.

In summary, no written joint venture agreement exists. While the evidence shows that joint venture status may have been one of several possibilities considered by the parties, their actual conduct evidences that it was not the arrangement ultimately adopted to govern their work on the system.

## B. THE PARTIES HAD NOT REACHED AN AGREEMENT TO FUNCTION AS A JOINT VENTURE AFTER THE SYSTEM BECAME COMMERCIALLY VIABLE.

In *Brenner v. Plitt*, 182 Md. 348, 34 A.2d 853 (1943), the court stated:

To constitute a "joint venture" or "joint adventure," as it is sometimes called, it is not sufficient that parties share in profits and losses, but they *must intend to be associated as partners*, either as general partners, or merely for the duration of the joint venture.

*Id.* at 355, 34 A.2d at 857, emphasis added.

It is hornbook law that parties who have not reached a meeting of the minds or a common intention have not completed an agreement. Without mutual assent, whether demonstrated by words or acts, there is no contract. *E. g., 5 Maryland Law Encyclopedia* 373; *Post v. Gillespie*, 219 Md. 378, 149 A.2d 391 (1959).

Preliminary negotiations about the terms of the contract do not constitute the contract. When material issues, as opposed to details, have not been settled, the conduct and writings are negotiations, not an agreement. While the intent to form a contract may be inferred from conduct, such an inference cannot be made when the evidence demonstrates that the parties had not yet reached an understanding. *Beck v. Bernstein*, 198 Md. 244, 248, 81 A.2d 608 (1951); *Peoples Drug Stores v. Fenton*, 191 Md. 489, 494, 62 A.2d 273 (1948).

Applying these basic contract principles to the facts of the present case, the testimony and documentary evidence show that there was no "meeting of the minds" to form a joint venture for the commercial phase of the project, which was becoming a reality by February, 1978. Since this status does not arise by operation of law, no joint venture exists.

An early letter concerning the system from Sturm to Nixon, signed by Nixon, embodies various understandings among them that IMCO would be "sole owner" of the dictionary, programs and related documents, with CISCO having a right of first refusal to perform as a data processing center for stenotype transcriptions in the Baltimore-Washington area. Since CISCO ceased to operate, this agreement has been superceded.

A letter, dated August 6, 1974, from Sturm to Banz, initialed by Banz, states in part:

In prior discussions and at my suggestion we have explored the possibility of a joint venture as opposed to an independent contractor arrangement between our companies. Although these discussions were abandoned at our recent meeting, I willingly will reopen serious negotiations at your request with the hopeful intent that an arrangement of reciprocal benefit can be established.

In a letter of March 18, 1977 to Sturm at IMCO, Nixon sets forth his understanding of their relationship and an interest in making future plans. The letter indicates that Nixon was receiving a salary, and that he hoped to get "a yet-to-be-specified percentage of the equity of Steno-o-Scribe, or if it is decided to keep Steno-o-Scribe as a closed corporation, a percent of the profits." The letter concludes:

> . . . I do not want to appear too "money conscious" at this early date, but I feel it necessary to define this whole area for two reasons. First, I do not like quibbling about money. I would like to lay out our rules and plans and have them automatically implemented as the goals are met. .. . . (I)f I know that we have a perfect understanding, I am satisfied to borrow the money I need on a monthly basis until we do hit that magic "profitable" status.

The testimony at the hearing bore out the strong indications in these writings that the defendants never reached an agreement with plaintiff as to their roles after the product became marketable. The issue was subject to much negotiation, and the parties continued to develop the system despite unresolved differences. While the defendants hoped to receive additional financial benefits once the project became a commercial success, there is no evidence that the form and extent of any such benefits was agreed upon. The plain fact is that no agreement for joint ownership was ever reached. As stated, an agreement will not be implied where the clearest fact in the evidence is that there was no agreement. A hope of sharing in profits does not constitute a joint venture.

Since neither the past conduct of the parties nor their future plans shows anyone other than IMCO as having a proprietary interest in the system, plaintiff is entitled to replevy the property taken from the Gaithersburg premises earlier this year. This includes all items relating to or part of the stenotype system, and all documentation needed for persons with appropriate skill and training to utilize the work done.

Defendants' contention that the work was not documented is unreasonable. Given the technological complexity of the work, it is inconceivable that records of the processes involved in the system were not maintained.

Further, even if proper documentation does not exist, defendants have an obligation to correct inadequacies in recording their work, as such documentation was surely a part of the work for which they understood they were being paid. The evidence shows that the essence of defendants' jobs with plaintiff was project development, not simply production of one or more models. To hold otherwise would be to hold that the parties agreed to terms of business which would have required a regular reinvention of the wheel.

The testimony of all defendants showed that they clearly understood that work was to be kept confidential. Employees have a duty of loyalty to the employer. While they can prepare for a new business, they cannot actively compete with the employer or usurp opportunities obtained during the course of employment. Injunctive relief is appropriate to prevent an employee from appropriating work done for the employer. *C–E–I–R, Inc. v. Computer Dynamics Corp.*, 229 Md. 357, 183 A.2d 374 (1962); *Ritterpusch v. Lithographic Plate Service, Inc.*, 208 Md. 592, 119 A.2d 392 (1956). Even if defendants were, at times, independent contractors, their understanding of confidentiality would impose a similar duty.

Defendants are entitled to take advantage of their skills in future work, and to utilize information in the public domain.

However, their rights must be balanced against the right of IMCO to have the benefit of work performed for it under an agreement of confidentiality.

Accordingly, it is this 7th day of July, 1978, by the United States District Court for the District of Maryland, ORDERED:

1. That the defendants return to plaintiff all property from the Gaithersburg premises which is part of, or relates to the stenotype system, including documentation necessary to enable someone of appropriate skill and training to comprehend and utilize the work done for IMCO.

2. That the defendants supply documentation, which may be missing, in accordance with the above guidelines; and

3. That the defendants are enjoined from producing or conveying to others knowledge of the stenotype system developed in the course of their business relationship with IMCO for use in court proceedings, and in litigation generally, for a period of three years.