**PRESIDENTIAL MOTOR YACHT CORPORATION, Plaintiff,**

v.

**PRESIDENT MARINE, LTD., Defendant.**

**Civ. A. No. 88–2929 SSH.**

United States District Court, District of Columbia.

Nov. 29, 1990.

John R. Ferguson, Andrew L. Lipps, Elaine R. Lubin, Washington, D.C., for plaintiff.

John F. Sherlock, III, Washington, D.C., for defendant.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter now is before the Court on cross-motions for summary judgment, plaintiff's motions for a separate trial and a protective order against certain discovery, and plaintiff's and defendant's motions for sanctions. Plaintiff seeks a declaratory judgment that a partially-executed settlement agreement between the

parties concerning their contractual disputes is binding and enforceable. Defendant seeks a judgment that no such agreement was reached and counterclaims for damages based on the past disputes. Plaintiff also seeks to bifurcate the trial to determine first whether a settlement agreement was reached. For the reasons set forth below, defendant's motion for summary judgment is granted, and, accordingly, plaintiff's cross-motion for summary judgment, motion to bifurcate the trial, and request for a protective order are denied. Plaintiff's motion for sanctions is denied as unfounded, and judgment on defendant's motion for sanctions is reserved pending resolution of the underlying contract dispute. A status call will be scheduled so that discovery may proceed on the underlying contract dispute.

### Background

This is an action for breach of contract. Plaintiff Presidential Motor Yacht Corporation (PMYC) is a Maryland-based wholesale distributor of motor yachts formed in late 1986 or early 1987 as the result of a merger between two yacht distributors, at least one of which had regularly purchased yachts from defendant President Marine, Ltd. (PML), a Taiwanese manufacturer of motor yachts.

PML granted PMYC the exclusive right to import, sell, and deliver its yachts in the United States (except for Washington and Oregon) and the Caribbean in return for PMYC's promise to purchase a minimum number of boats between 1987 and 1991, according to a December 1986 exclusive dealership agreement. Two conditions attached to the dealership agreement: (1) that PMYC's predecessors were to complete their merger by December 31, 1986, and (2) that PMYC was to have sufficient credit to support the agreed-upon order rate at the completion of the merger. The agreement would become null and void if either condition was not met.

Following this agreement, disputes arose between PML and PMYC concerning PMYC's ability to purchase the PML boats which it had agreed to buy, PMYC's ability

to compensate PML for currency fluctuations between Taiwanese and American dollars as specified in the agreement, and PML's obligation to perform warranty work on PML yachts sold to PMYC customers. On May 30, 1988, PML's Managing Director, Eddie Yeh, notified PMYC that both conditions of the 1986 agreement had been violated and that the agreement therefor was null and void. In the May 30 notification, PML cataloged grievances concerning PMYC's performance under the contract and informed PMYC that it was no longer an exclusive distributor of President Marine yachts.

In a reply fax dated June 6, William Poteat, president of PMYC, maintained that both conditions of the December 1986 agreement had been satisfied, and rejected PML's contention that the agreement was null and void. According to Poteat's fax, PML's additional grievances were not grounds for nullifying the agreement. Further, Poteat complained about PML's performance under the contract.

Poteat's June 6 fax was the last direct communication between PMYC and PML until more than three months later. On September 13, 1988, PML's Yeh sent a fax to Poteat reiterating his belief that the December 1986 agreement was null and void, rejecting Poteat's June 6 contention that the agreement was still operative, and threatening a lawsuit. The September 13 fax was sent despite the fact that (1) Karl Von Kirchoff had replaced William Poteat as president of PMYC in the middle of July 1988, and (2) that negotiations concerning a settlement agreement between PMYC and PML had been ongoing since June 1988 and appeared close to completion around the time the fax was sent.

Beginning in June 1988, Ronald Furfiord, the only authorized PML dealer in the United States other than PMYC, began to act as an intermediary between PML and PMYC. According to Furfiord, PMYC's Poteat asked him in the beginning of June to intervene with PML to see if he could help effect a resolution of PMYC's and

PML's disputes.[1] Furfiord, however, had some 10 days earlier helped to draft, and then reviewed, PML's May 30 termination and nullification notice to PMYC. Furfiord did not disclose that prior role to Poteat.

Between June and October 1988 PMYC and PML through Furfiord drafted several settlement agreements. The agreement eventually evolved into a two-part document. Agreement #1 attempted to resolve ongoing financial disputes tied to currency fluctuations and warranty claims. Agreement #2 would have transferred PMYC's exclusive dealership rights to sell PML boats back to PML in return for a percentage of PML sales in PMYC's former United States' sales territory.[2]

During negotiations concerning these agreements, PMYC discovered that PML had arranged to deliver two PML boats to non-PMYC distributors. PMYC apparently did not take any legal action against what it perceived to be a violation of its exclusive distributorship based on the alleged representations of Furfiord that PMYC and PML were in agreement on settlement terms, and that signing of a binding document to that effect was imminent.

On September 19, 1988, PML's Yeh sent his own version of the agreement to Furfiord for comments. Furfiord sent his initial comments back to Yeh the same day. The next day Furfiord faxed PMYC's Von Kirchoff his latest draft of the agreement. After exchanging draft versions, PMYC and Furfiord both signed a document, believing it to be a final version of the agreement. On September 22, Furfiord sent this partially executed finalized proposed agreement to PML's Yeh. Meanwhile, Yeh had left Taiwan September 20 to attend to business in Europe. Because either he did not or could not locate a fax machine, Yeh did not receive a copy of the partially executed agreement until he left Europe and arrived in the United States.

Yeh did not sign the agreement upon receiving it in the United States. After attending a boat show in Florida, Yeh traveled to the District of Columbia where he arranged a meeting with PMYC's Von Kirchoff. At that meeting, Yeh refused to sign the agreement. During a meeting the next day, Von Kirchoff served Yeh with process in this case.

According to PMYC, the version drafted by Yeh (which he agreed to sign) and the later version Yeh refused to sign did not differ materially. PML, on the other hand, contends that language in the partially executed September 22 agreement contained provisions concerning warranty obligations and other items which were not acceptable. Consequently, PML argues that there was no mutual assent and no agreement. PMYC contends that Furfiord was an agent of PML with authority to bind it to agreements. PML and Furfiord deny that he had such power.

PMYC alleges that PML unilaterally repudiated a binding oral settlement agreement resolving their contract disputes. PMYC seeks a declaratory judgment to enforce the partially executed agreement. In the alternative, PMYC seeks to enforce its rights under the supposedly exclusive and ongoing dealership agreement between the two parties. PML, on the other hand, maintains that no settlement agreement was ever reached and that PMYC violated the terms of the exclusive dealership agreement, rendering it null and void. PML counterclaims for damages arising out of the underlying contract disputes.

## Discussion

■ Jurisdiction in the District Court for the District of Columbia is proper because an alien may be sued in any district. 28 U.S.C. § 1391(d). Although venue considerations would permit this action to be brought elsewhere, a change of venue would not be significantly more convenient for the parties. The fact that defendant

---

1. Furfiord, as president of Pacific Yacht Sales, Inc., of Seattle, Washington, had prior business dealings with PMYC.

2. According to draft versions of the agreement, PMYC would be entitled to "2% of the gross amount of all orders placed from U.S.A. dealers at a limited cap (maximum amount) of [$]300,-000," in PMYC's former sales territory.

received service of process in the District of Columbia and that his attorney is located in this District are additional considerations making venue proper here.

### Choice–of–Law

■ Maryland law is dispositive in the present case based on choice-of-law and "governmental interest" considerations. "In the exercise of diversity jurisdiction a district court looks to the law of the state in which the court sits to determine what conflict of laws rule is applicable." *Chesapeake & Potomac Tel. Co. of Maryland v. Allegheny Constr. Co.*, 340 F.Supp. 734, 739 (D.Md.1972) (quoting *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Accordingly, this Court must turn to District of Columbia law in order to ascertain the applicable law. "In determining the formation and validity of contracts, the District of Columbia applies the law of the jurisdiction with the 'more substantial interest in the resolution of the issue.'" *Owen v. Owen*, 427 A.2d 933, 937 (D.C.App.1981) (quoting *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C.App.1970)). *See also Packer v. Kaiser Foundation Health Plan of the Mid–Atlantic States, Inc.*, 728 F.Supp. 8 (D.D.C.1989). The District of Columbia's connection to the present case is relatively incidental. Process was served on the alien defendant here and the defendant's attorney is located in this District. By contrast, Maryland's interest in the resolution of the case is considerably greater. The negotiations concerning the disputed settlement agreement were conducted in part in Maryland; defendant had substantial business ties to the state through its regular sale of boats in Maryland; and the underlying contract disputes developed in part in Maryland. Further, defendant does not oppose reliance on Maryland law. Maryland's commercial code was designed to protect and promote business in that state. Accordingly, Maryland's substantial interest dictates that its law control the present dispute.

### Validity of Contract

A necessary component of every contract is the parties' mutual assent. *Institutional Management Corp. v. Translation Systems, Inc.*, 456 F.Supp. 661, 669 (D.Md. 1978); *Klein v. Weiss*, 284 Md. 36, 395 A.2d 126, 141 (1978); *Maryland Supreme Corp. v. Blake Co.*, 279 Md. 531, 369 A.2d 1017, 1023 (1977). Without a meeting of the minds, demonstrated either by words or acts, there is no contract. *Institutional*, 456 F.Supp. at 669. Thus, the parties to a contract, by their conduct, must recognize the existence of such an agreement. Md. (Com.Law) Code Ann. § 2–204 (1990).

■ Here the record indicates that the parties never came to a final agreement on material terms regarding PML's warranty obligations and PMYC's responsibility for failing to obtain credit to purchase at least one boat which PML built for it. Thus, the draft versions which PML and PMYC were exchanging through Furfiord were still preliminary versions of an agreement. "Preliminary negotiations about the terms of the contract do not constitute the contract. When material issues ... have not been settled, the conduct and writings are negotiations, not an agreement." *Institutional*, 456 F.Supp. at 669. When the parties cannot reach an agreement concerning a material term, there is no mutual assent. "Either party is at liberty to put an end to the negotiations until actual completion of the bargain." *Beck v. Bernstein*, 198 Md. 244, 81 A.2d 608, 610 (1951).

PMYC alleges that PML orally assented to a settlement agreement resolving the parties' contractual disputes. In part, PMYC bases this claim on the assertion that a version of the agreement which PML drafted, and the version which PMYC and Furfiord drafted and then signed, were not materially different. A comparison between PML's September 19 draft version of the agreement and the September 22 partially executed agreement signed by Von Kirchoff and Furfiord, however, reflect important unresolved differences between PML's and PMYC's versions.

Section IA of Agreement # 1, in both versions of the agreement, specified that

PMYC owed money to PML as a result of currency fluctuations affecting the exchange rate between the Taiwanese currency and American dollars. But PML's draft sought additionally to make PMYC liable for failing to obtain letters of credit necessary to purchase boats which they had ordered. The partially executed September 22 version contained no language concerning this issue.

There was also a distinct disagreement between the two sides concerning the wording of section 5 of Agreement # 2. According to the September 22 proposal, PML would "take over the warranty administration from PMYC for all new claims." But PML's September 19 draft specified that it would be responsible only for "the one-year limited warranty administration from PMYC for yachts still under limited warranty duration claims." PML's proposal reduced its financial obligations by making it liable only for claims it had previously agreed to accept. By contrast, the September 22 proposal could be read to make PML responsible for any claims, including work performed by PMYC altering a PML boat (to install additional equipment, for example), a contingency clearly outside the scope of PML's intentions.

Allegations that PML's draft of the agreement were not materially different from the one PMYC signed fail. "A contract, to be final, must extend to all the terms which the parties intend to introduce, and material terms cannot be left for future settlement." *Peoples Drug Stores, Inc. v. Fenton Realty Corp.*, 191 Md. 489, 62 A.2d 273, 276 (Md.1948). Thus, a comparison of PML's draft version of the agreement and the one signed by PMYC and Furfiord show that there was no mutual assent, and consequently no contract.

█ PMYC further alleges that proof of PML's binding acceptance of an agreement is evident in (1) PML's internal correspondence and correspondence to Furfiord, and (2) oral statements made by PML to Furfiord and another boat dealer that PML had assented to a settlement agreement.

The first document that PMYC cites as evidence of PML's assent is a September 15 fax from PML to Furfiord referring to the latest draft version of the agreement: "Basically the agreement is OK but we'd like to add a couple more letters to make it more clearly [*sic*] and understandable. But I was tied up with some ... buyers.... Please give me a little more time for the agreement. I will fax it back to you of the agreement [*sic*] ASAP soon."[3] This communique clearly reflects the continued preliminary nature of the discussions.

The second document PMYC cites is PML's September 19 draft of the agreement. In a message Yeh sent to Furfiord with the draft agreement, he indicated his continued interest in negotiations unless PMYC attempted to impound boats PML was sending to other dealers in PMYC territory. According to the message, Yeh indicated that Furfiord should examine the September 19 draft and send it back to him because he is "able to sign the telefax communication any time." This, however, cannot be read to mean that Yeh would sign regardless of changes to the agreement.

Next, Yeh traveled to Europe. Before he left, Yeh called his secretary from the airport and she in turn contacted Furfiord in what is PMYC's third document allegedly proving assent: "Eddie calls me at airport and instruct me to tell you that please ask Von [Kirchoff] sign the agreement and fax it to me so that I can transfer the assignment to him for his signature." But on September 26, Furfiord contacted PMYC's Von Kirchoff in a fax that clearly demonstrates the continuing preliminary nature of the negotiations: "Susan was going to forward the agreements to Eddie as soon as she had a fax number to use. Eddie was to sign if he agreed to it...."

Following Yeh's trip to Europe, he arrived in the United States at the beginning of October and received the September 22 partially executed version of the agreement. Yeh arranged an October 10 meeting with Von Kirchoff in Washington, D.C.,

---

3. This fax reflects Yeh's incomplete grasp of the English language.

during which he refused to sign the agreement. None of these three documents, however, proves that Yeh assented to an agreement. With draft versions traveling back and forth between the parties it would be unreasonable to expect a businessman to sign an agreement he had not seen. These fax communications clearly reveal that no agreement had been reached.

PMYC also attempts to prove PML's oral assent to an agreement by pointing to separate discussions between Yeh and Furfiord and Yeh and another boat dealer (Jeffery Johnston) in which Yeh supposedly told each of them that he had concluded the agreement with PMYC.[4] Regardless of whether this type of evidence would be admissible, both Furfiord and Johnston denied the allegations in affidavits and during depositions.[5]

■ It is established law that a signature is not always necessary to create a binding agreement. "[A] signature is not required in order to bring a contract into existence, nor is a signature always necessary to the execution of a written contract." *Porter v. General Boiler Casing Co.,* 284 Md. 402, 396 A.2d 1090, 1095 (1979). But it is equally true that "[t]he purpose of a signature is to demonstrate 'mutuality of assent' which could as well be shown by the conduct of the parties." *Id.* (citation omitted). However, in the present case both the absence of a signature and the conduct of the parties demonstrate the lack of agreement. By refusing to sign the proposed settlement agreement, PML manifested its disagreement with the content of the documents. Since previous agreements between PML and PMYC were signed, and because of the implicit expectation that the

agreement would not be binding until signed, lack of a signature absent conduct to the contrary shows that there was no contract.

### Agency

■ Finally, PMYC argues that Furfiord was a PML agent with authority to bind PML to agreements. The existence of an agency relationship is determined by a three-prong test: "(1) the agent is subject to the principal's right of control; (2) the agent has a duty to act primarily for the benefit of the principal; and (3) the agent holds a power to alter the legal relations of the principal." *Proctor v. Holden,* 75 Md. App. 1, 540 A.2d 133, 142 (1988) (citations omitted). It is PMYC's obligation to prove the existence of these factors. "When an agency relationship is to be inferred from the parties' conduct, the party alleging the agency has the burden of proving its existence and its nature and extent." *Id.* (citations omitted). Although Furfiord admitted that his ultimate allegiance was more to PML than to PMYC, it was in his best interest that both sides reach an agreement because he was entitled to $10,000 for his time and effort in acting as intermediary, and because legal difficulties for PML would in all probability not be beneficial for his business of selling PML yachts. PMYC has presented no evidence indicating that PML controlled Furfiord's negotiations with PMYC regarding the proposed settlement agreement, or that Furfiord had the power to alter PML's legal relations.

### Sanctions

■ PMYC's motion for sanctions is denied. There is no indication, contrary to

---

4. Johnston was one of the non-PMYC yacht dealers to whom PML sent a boat during settlement negotiations with PMYC. According to depositions, Johnston was anxious that PML and PMYC settle their contract problems before he agreed to accept a PML boat so that he would avoid becoming involved in their legal dispute. During Yeh's deposition, he admitted that he told Johnston that Johnston would not have to worry about his boat being seized. Yeh also insisted that he did not tell Johnston that an agreement between PMYC and PML had been reached.

5. PML's behavior cannot be characterized as ethical. Furfiord was not an entirely neutral intermediary, and Yeh appears to have delayed notification to PMYC that the agreement was not satisfactory until after the PML boats arrived in the United States in late September or early October. But it is the role of the Court to judge the legality, not the morality, of contracting.

PMYC's assertion, that PML purposefully failed to produce certain documents during discovery. Moreover, the three documents that PMYC alleges PML knowingly withheld are not particularly damaging to PML. In fact, certain of these documents are more helpful to PML than PMYC in that they seem to prove PML's position that no binding settlement agreement had been reached between the two parties.

 As for PML's motion for sanctions, the Court reserves judgment pending a resolution of the underlying contract dispute between the parties. PML alleges that PMYC's pleading is not well grounded in fact because in a separate action PMYC argued that it breached its agreement with PML, whereas in this action PMYC denies breaching the December 10, 1986, exclusive dealership agreement. In *Presidential Motor Yacht Co. v. First American Bank of Virginia*, No. 3111380 (Cir.Ct. Anne Arundel Oct. 24, 1989), *appeal dismissed* (Md.Ct.Spec.App. Feb. 9, 1990), PMYC in its verified complaint alleged that "the failure of First American to issue the letter of credit in question would render Presidential in breach of its obligation to President Marine, Ltd." [6] Until this court determines the exact nature of PML's and PMYC's course of dealing and the status of the December 10, 1986, agreement it cannot rule on this motion. In other words, it is not entirely clear whether PMYC in its verified complaint against First American Bank of Virginia is referring to the December 10, 1986, exclusive distributor agreement with PML or some subsequent modified agreement. Further, it is not yet clear whether failing to obtain this particular letter of credit would constitute a non-curable breach.

For the foregoing reasons there was no binding and enforceable settlement agreement reached between the parties. Plaintiff's motion for a separate trial to settle the issue of whether a binding settlement agreement had been reached and request for a protective order protecting it from

discovery concerning the underlying contract dispute between the parties are denied.

---

**6.** The letter of credit in question was one for $339,534 which PMYC was obligated to advance to PML before PML delivered to PMYC a boat

which PMYC had ordered and which PML constructed.