SWIFT BROTHERS

v.

SWIFT & SONS, INC., Robert Swift, Sr., and Robert Swift, Jr.

Civil No. 89–5253.

United States District Court, E.D. Pennsylvania.

Dec. 11, 1995.

Barbara A. Brown, Glenside, PA, Daniel H. Golub, Philadelphia, PA, Gregory Marchesini, Sandler & Marchesini, Philadelphia, PA, Arthur L. Gutkin, Conshohocken, PA, Robert T. Vance, Jr., Vance, Jackson, Simpson & Vance–Lewis, Philadelphia, PA, Joseph E. Bresnan, Acton, Herder & Bresnan, Ambler, PA, for Swift Bros.

Franklin A. Wurman, Elkins Park, PA, Gregory Marchesini, Paul N. Sandler, Sandler & Marchesini, Philadelphia, PA, for Swift & Sons, Inc., Robert Swift, Sr., Robert Swift, Jr.

## OPINION

LOUIS H. POLLAK, Senior District Judge.

James D. Swift and Robert Swift, Sr. are brothers. The two were business partners, under the name Swift Brothers, from 1963 to 1984. Then, in September 1984, a dispute between them led Robert Swift to leave the partnership, and to establish a new business, named Swift and Sons. The present case derives from that dispute, as well as from the alleged conduct of both brothers in the years that preceded and followed it.

The plaintiff in this case, Swift Brothers, is a partnership and a successor to the Swift Brothers that existed from 1963 to 1984; James (also called "Pete") Swift is one of the partners in the present Swift Brothers. Robert Swift, Sr., is the sole shareholder of Swift and Sons, the firm he began to operate after leaving Swift Brothers. Both Robert Swift, Sr. and his firm are defendants in this case. The third defendant, Robert Swift, Jr., is the son of Robert Swift, Sr., and a corporate officer of Swift and Sons. (Because Robert Swift, Jr. is a relatively minor player in the present drama, the elder Robert Swift will at times be referred to simply as "Robert Swift," when this usage appears unlikely to lead to confusion.) Presently before the court is the defendants' motion for summary judgment.

### I. *Background.*

As is customary in ruling on a motion for summary judgment, the following account of the facts is derived from the pleadings and is read in the light most favorable to the non-moving party, who here is the plaintiff.

James Swift and Robert Swift, Sr. first formed a partnership named Swift Brothers in June, 1963. The partnership was the successor to a similar business that had been established by James Swift in 1960. There was no written partnership agreement, but the terms of the partnership were that "each partner was to share equally in the profits and losses of the business, that each partner be engaged full time in the business and receive equal salaries and draws, and that any real estate acquired in joint names be held equally." Complaint, ¶ 45.

Swift Brothers' business was the delivery of janitorial services, including office cleaning, house cleaning, carpet shampooing, floor waxing, window cleaning, and smoke and odor removal. The partnership has delivered those services in Philadelphia and surrounding areas (including, at least at some times, in New Jersey and in Delaware) since 1963. Since the partnership was established, Swift Brothers alleges that it has spent approximately \$411,772.79 promoting and advertising its name in various media. Swift Brothers asserts that its services "have enjoyed widespread and favorable public acceptance" in the area in which it operates, and that its trademarks have a substantial value.

The defendant, Swift & Sons, Inc., is a corporation that provides janitorial services of the same general type and in the same geographic area as does Swift Brothers. Robert Swift, Sr., a former partner in Swift Brothers, holds all of the common stock of Swift & Sons. His son, Robert Swift, Jr., is

a former employee of Swift Brothers, and is now an employee and officer of Swift & Sons.

Robert Swift, Sr.'s departure from Swift Brothers, and establishment of Swift & Sons, occurred under less than amicable circumstances. In late 1983, James Swift, who has been suffering from a chronic heart condition since 1980, required hospitalization and surgery. As a result of this illness, James Swift continued some general administrative duties, but devolved most of the responsibility for the day-to-day operations of the partnership upon Robert Swift, Sr. In spring 1984, Robert Swift asked James Swift to move the partnership's business records from James Swift's home to the partnership's office, to allow easier access. In mid–1984, James Swift returned to work full-time.

In September, 1984, without notice, Robert Swift, Sr. left Swift Brothers. When Robert Swift, Sr. left, he took with him most of the materials used in the day-to-day operation of Swift Brothers, including the business records, some estimates, consumer lists, supplies, office furniture, and a car (which was titled in Robert's name but which Swift Brothers asserts was considered a partnership asset). Robert Swift, Sr. had incorporated a firm named Swift & Sons some years earlier, in 1981 or 1982.[1] After leaving Swift Brothers, he began to operate this firm, with the assistance of his son, Robert Swift, Jr. Swift & Sons almost immediately ran newspaper and Yellow Pages advertisements for its services; Swift Brothers claims that these had been prepared and paid for some time before Robert Swift's departure.

Swift Brothers asserts that, before Robert Swift left the partnership, he repeatedly took partnership assets and business for his own use. In support of this claim, Swift Brothers presents deposition testimony in which Rob-

ert Swift, Sr. states that he "sometimes" took partnership money as his own. Plaintiff's Exhibits at 32. Swift Brothers also presents an affidavit from a former Swift Brothers employee, Larry Johnson, who states that, while Robert Swift was with Swift Brothers, he at times conducted "secret jobs" in which he would arrange for work (usually, but not always, window-cleaning work[2]) to be done without James Swift's knowledge, and then keep the proceeds. Customers were asked to pay for these jobs either in cash or with a check made out to Robert Swift. Larry Johnson also claims that Robert Swift maintained two sets of books, one made available to James Swift, and the other used to record the "secret" work. *See* Affidavit of Larry Johnson, Plaintiff's Exhibits at 49. Swift Brothers asserts that Robert Swift's "secret" work included jobs for new customers and permitted Robert Swift to develop an independent client base before beginning to operate as Swift & Sons.[3]

After his departure from Swift Brothers, Robert Swift, Sr. began to actively compete with Swift Brothers for what had formerly been Swift Brothers' clients. Some of this competition took the form of advertising. Swift & Sons placed an advertisement in the *Chestnut Hill Local* that identified the firm as "Swift & Sons, Inc., formerly Swift Brothers." It also placed an advertisement in the Donnelly Directory, a business directory or "yellow pages," referring to "25 YEARS OF RELIABILITY, DEPENDABILITY & SERVICE."

Swift Brothers also avers that Robert Swift told customers that James Swift had retired or moved to Chicago and that Swift Brothers was no longer in existence, and serviced former clients without notifying them that the same entity was no longer

---

1. The plaintiff's papers are inconsistent on this point.

2. The plaintiff also claims, however, that on at least one occasion Robert Swift, Sr. arranged for furniture that had been in a fire-damaged building that Swift Brothers had been ordered to clean to be sold at auction, and kept the proceeds.

3. Swift Brothers presents one example of such a client, William Schrope, who asserts in an affida-

vit that in January 1984, before Robert Swift's departure from Swift Brothers, he told Robert Swift to have "Pete" (James) Swift come clean his offices. Robert Swift "said he can handle it" and cleaned the office from January 1984 to November 1984, when Mr. Schrope received a bill from Swift & Sons for an eleven-month period. Schrope then called Robert Swift, told him he had assumed that he was doing business with Swift Brothers, cancelled his service, and started with Swift Brothers. Affidavit of William Schrope, Plaintiff's Exhibits at 48.

servicing their accounts. (James Swift wrote to customers to provide them with his side of the story, but Swift & Sons was already doing cleaning work for many of them, and they were reluctant to involve themselves in a family dispute, and so did not respond.) Finally, a former Swift Brothers employee claims that in 1989 he observed Alan Swift, a brother of James and Robert Swift, sitting at James's office desk and giving customer information over the telephone to someone named "Bob." Affidavit of Michael Moore, Exhibits at 55.

Swift Brothers filed suit against Swift & Sons, Inc., Robert Swift, Sr., and his son, Robert Swift, Jr., on July 18, 1989. The complaint made a range of claims, some of which have subsequently been modified or abandoned; the claims will be discussed in detail below. Briefly, however, they are:

1. A claim under the Lanham Act;

2. Claims of unfair competition, injury to business reputation, and misappropriation of goodwill;

3. A claim of tortious interference and diversion of funds;

4. A claim of misappropriation of trade secrets; and

5. A claim of breach of fiduciary duty.

Robert Swift, Sr. filed a counterclaim seeking an accounting of partnership operations and assets, and demanding that Swift Brothers pay over to him his share of partnership assets. The counterclaim also asserted that James Swift had refused Robert Swift access to the books of the partnership while the partnership was in operation, and that James Swift had diverted in excess of $25,000 a year of partnership funds to his own use.

Since the complaint was filed, this case has been subject to far more than its share of the ordinary vicissitudes of litigation. Efforts by this court to facilitate settlement, which included a "mini-trial" conducted before Magistrate Judge Hall, were, alas, not successful. The plaintiff has changed attorneys three times, and the defendants have changed attorneys once. The parties consented to the appointment of an independent expert to conduct a valuation of the two businesses involved, a process that, while it was helpful,

also produced delay, as it, *inter alia,* required the parties to agree on an appropriate expert. Finally, the very regrettable illness of James Swift has necessitated occasional continuances. Now, however, Swift Brothers has obtained new counsel, and this court has assured the parties that it will endeavor to clear away any further obstacles to a rapid resolution of this matter.

To simplify analysis of this case, the plaintiff's claims will be divided into two broad categories: those relating to events occurring up to and including Robert Swift, Sr.'s departure from Swift Brothers in September 1984, and those relating to events that occurred thereafter.

## II. *Events Occurring Before Robert Swift's Departure from Swift Brothers*

Before discussing the claims relating to Robert Swift's departure in any detail, it may be useful to discuss the precise nature and legal effect of Robert Swift, Sr.'s departure from Swift Brothers in September 1984. The parties appear to be in agreement that Robert Swift's departure from the partnership in September 1984 effected the dissolution of the partnership. *See* 15 Pa.C.S.A. § 8353 (Supp.1995) ("Dissolution is caused: (1) Without violation of the agreement between the partners: ... (ii) By the express will of any partner when no definite term or particular undertaking is specified."). Swift Brothers continued in existence after its dissolution for purposes of winding up partnership affairs, an event that has not yet occurred. 15 Pa.C.S.A. § 8352 (Supp.1995) ("On dissolution, the partnership is not terminated but continues until the winding up of partnership affairs is completed.").

However, the Swift Brothers that is a plaintiff in the present case is a distinct entity from the Swift Brothers from which Robert Swift withdrew. (Indeed, James Swift has had other business partners since his brother's withdrawal from the partnership.) It also appears that, for purposes of determining the respective rights of the two partners to the assets of the partnership from which Robert Swift withdrew, the proper plaintiff is not Swift Brothers, but James Swift; the court will order that this technical

defect be corrected through an amendment to the caption of this case.

The claims based on events occurring before September 1984 all involve rights and duties running between the two partners and the partnership. These claims include the claims by each partner that the other misused partnership assets; James Swift's claim that Robert Swift diverted business from the partnership; and the dispute between the two partners as to their respective entitlements to partnership assets.

■ All of these claims must be brought as elements of the outstanding claim for an accounting. As a general rule, actions between partners, or between partners and their partnership, for enforcement of rights and duties deriving from the partnership relationship "may be brought only in an accounting action." Alan R. Bromberg & Larry R. Ribstein, 2 *Bromberg and Ribstein on Partnership* § 6.08 at 6:102 (1991). This rule has widely been found applicable to actions alleging diversion or misuse of partnership assets, *see, e.g., Institutional Management v. Translation Systems*, 456 F.Supp. 661, 665 (D.Md.1978). Although the courts of the Commonwealth of Pennsylvania have not articulated this rule explicitly, they routinely treat claims of partners' breach of partnership obligations as matters to be resolved in equity.[4]

■ The accounting claim will, of course, be tried to the court, not to a jury. *See Kline Hotel Partners v. Aircoa Equity Interests*, 729 F.Supp. 740, 743 (D.Colo.1990) ("[A] partnership accounting is equitable and thus no right to a jury trial attaches"); *see also Ross v. Bernhard*, 396 U.S. 531, 532–33, 90 S.Ct. 733, 735, 24 L.Ed.2d 729 (1970) (noting

that there is no Seventh Amendment jury trial right for suits in equity or their present-day equivalents). The parties have not yet addressed the question of the respective shares of Swift Brothers' assets to which the partners were entitled. It would appear, however, that, after the satisfaction of any outstanding amounts owed to the partnership's creditors and to the partners, the remaining assets of the partnership would be profits to be divided equally between the former partners, in accordance with their agreement that profits are to be divided equally.[5] The partnership's property would of course include such items as the cash in the partnership's bank account as of dissolution, its equipment, its real property, its then-existing contracts with clients, and the partnership's goodwill.

The accounting would take into account any items taken or retained by each of the two partners at the partnership's dissolution. As to James Swift, this would include, for instance, any clients that Swift Brothers retained, any supplies not removed by Robert Swift, and the partnership's real estate. As to Robert Swift, Sr., this might include the working supplies, car, and office furniture that he allegedly took upon departure, as well as any clients that he induced (by whatever means) to shift to his business. There may be some difficulties in establishing precisely how many of Swift Brothers' former clients are now clients of Swift and Sons, as Swift and Sons claims not to maintain any records of its customer base, Plaintiff's Exhibits at 3–5, a remarkable, but perhaps not impossible, claim. It will also be necessary to ascertain what the dollar income associated with each client was, as customers are

---

**4.** *See, e.g., Glazer v. Kurman*, 384 Pa. 283, 120 A.2d 892, 894 (1956); *Clement v. Clement*, 436 Pa. 466, 260 A.2d 728, 728–29 (1970).

**5.** The applicable statute provides:
 In settling accounts between the partners after dissolution, the following rules shall be observed, subject to any agreement to the contrary:
 (1) The assets of the partnership are:
 (i) The partnership property;
 (ii) The contributions of the partners necessary for the payment of all the liabilities specified in paragraph (2).

(2) The liabilities of the partnership shall rank, in order of payment, as follows:
(i) Those owing to creditors other than partners;
(ii) Those owing to partners other than for capital and profits;
(iii) Those owing to partners in respect of capital;
(iv) Those owing to partners in respect of profits.
15 Pa.C.S.A. § 8362 (Supp.1995).

best measured in terms of their contribution to the partnership's income stream.[6]

The allocation of the firm's goodwill between the two partners presents special difficulties. Swift Brothers has not presented any grounds for concluding that James Swift had an exclusive right to continue to use the partnership's name. (Such a right might have been created by agreement between the partners at the establishment of the partnership, for instance, or by agreement upon distribution of the partnership's assets.) Thus, both partners were equally entitled to describe the firms they operated following the partnership's dissolution as successors of Swift Brothers, and so to make use of the goodwill associated with the partnership's name. *See* Bromberg & Ribstein, *supra,* at § 7.11–7.12. James Swift in fact continued to use the name Swift Brothers for his business, apparently without objection from Robert Swift, and so may have retained more of the partnership's goodwill than did Robert Swift.

The partnership's customer records also require some discussion. Ordinarily, in the absence of an agreement to the contrary, partners have an equal right to use a partnership's customer records following dissolution. *See* Bromberg & Ribstein, *supra,* at § 7.12. In the present case, the plaintiff alleges that Robert Swift, Sr. took the partnership's records in their entirety upon his departure. Robert Swift asserts that it was possible to reconstruct these records from other documents available at the partnership's offices. Even if this is the case, James Swift may be able to argue that he should be compensated for the cost, difficulty, and unreliability of this task.

The accounting will also take into account the claims of pre-dissolution wrongful conduct made by the two partners against one another. This would include James Swift's claim that Robert Swift diverted partnership income and business to his own use, and Robert Swift's claim that James Swift withdrew more money from the partnership than he was entitled to withdraw. These claims are best characterized as breaches of obligations issuing from the partnership relationship (that is, as breaches of fiduciary duties), rather than in terms of the menagerie of economic tort claims made by the plaintiff.

■ The defendants question whether James Swift can present evidence to support his claim that Robert Swift was diverting income and business from the partnership. It appears that, at least for purposes of the present summary judgment motion, he can. The plaintiff provides two pieces of evidence to support his claim. The first is the affidavit of William Schrope, described above at footnote 3, which states that, nine months before Robert Swift left Swift Brothers, Schrope asked him to arrange for Swift Brothers to clean Schrope's property, but that Robert Swift in fact did the work independently, and billed him for it after leaving Swift Brothers. The second is the affidavit of Larry Johnson describing the "secret jobs" allegedly conducted by Robert Swift. *See* Affidavit of Larry Johnson, Plaintiff's Exhibits at 49. The defendants assert that the plaintiff has presented no evidence that these jobs were in fact secret. This claim is entirely unconvincing. The affidavit states, for instance, that Robert Swift maintained duplicate sets of books, a claim that amply suffices to indicate that the work in question was intended to be secret from James Swift.[7]

6. A gentleman named Samuel Kursh has apparently prepared a report for the plaintiff as to the post-dissolution income stream of Swift and Sons (or, as the plaintiff describes it, the lost income of Swift Brothers). The defendants assert that this report cannot be admitted into evidence because it is based upon information provided to Mr. Kursh by James Swift that has not been admitted into evidence, and because this information is not, in the words of Federal Rule of Evidence 703, of the "type that would be reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The parties have not argued this question

with any detail, however, and this is not in any event the appropriate time to resolve questions of admissibility.

7. If the "secret" work is found to have occurred, determining its exact scope may present some difficulties. The parties will need to present some indication of the frequency with which these "secret jobs" occurred and the amount of money involved; this would permit the court to estimate the amount of money diverted.

The plaintiff has provided a set of handwritten worksheets by James Swift estimating the extent

The resolution of some aspects of the accounting claim will require considerable financial expertise, and it is unclear at present what evidence will be presented to dispose of these questions. By agreement of the parties, a firm named Value Management, Incorporated has prepared a report on the value of Swift Brothers as of September 4, 1984. This document, and any additional materials submitted by the parties, will presumably shed some light upon the partnership's assets upon its dissolution. There remain, however, many unanswered financial questions, such as the value of the partnership's goodwill, which will presumably be clarified as this matter proceeds.

## III. Events Occurring After Robert Swift's Departure from Swift Brothers

The remainder of the claims in this case consist of a series of economic tort claims— and a Lanham Act claim, which is essentially the federal equivalent of an economic tort claim—based upon three alleged incidents or categories of incidents occurring after Robert Swift, Sr.'s departure from Swift Brothers. These are: (1) the advertisements placed by Swift and Sons in the *Chestnut Hill Local* and the Donnelly Directory; (2) James Swift's reports from his customers that they had been told by Robert Swift, Sr. that James Swift had retired or moved to Chicago and that Swift Brothers was no longer in existence; and (3) Alan Swift's alleged communication of Swift Brothers' customer information to Robert Swift, Sr. These alleged incidents will be discussed in sequence.

### A. Swift and Sons' Advertisements

The plaintiff claims that Swift & Sons placed an advertisement in the *Chestnut Hill Local* that identified the firm as "Swift & Sons, Inc., formerly Swift Brothers," and an advertisement in the Donnelly Directory referring to "25 YEARS OF RELIABILITY, DEPENDABILITY & SERVICE." (The second advertisement is appended to the complaint as Exhibit A; the plaintiff has not

provided the court with a copy of the first.) The plaintiff makes claims under the Lanham Act and a number of economic tort claims based upon these two advertisements.

■ The second advertisement is not false or misleading, and so cannot be actionable under any theory. At the time that the advertisement appeared, Robert Swift had been in the janitorial services business for at least twenty-one years, since Swift Brothers was formed in 1963, and possibly longer, if he had done work in the industry before that date. In any case, the distinction between twenty-one and twenty-five years of experience in the industry would not be meaningful to a reasonable reader.

The first advertisement could be read to be false or misleading, however, in at least one respect. Because it describes Swift and Sons as "formerly" Swift Brothers, it suggests that Swift and Sons is the *only* successor to the Swift Brothers in which Robert Swift, Sr. was a partner, and that no firm named Swift Brothers still exists. (To the extent that the advertisement suggests only that Swift and Sons is *a* successor to Swift Brothers, however, it is not actionable.)

The plaintiff have brought two sets of claims based upon this advertisement: a claim under the Lanham Act, and a group of state-law economic tort claims. The two groups of claims will be discussed separately.

#### 1. Lanham Act Claim

The Lanham Act provides that:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of

---

of discrepancies between estimated and actual partnership revenues between 1980 and 1984. Plaintiff's Exhibits at 56–60. It is possible, but by no means certain, that the results of such an analysis could be admissible; I will not rule on

that question now. In order to be credible evidence as to the extent of Robert Swift's alleged "secret" jobs, however, the analysis would need to be presented in a much clearer form, with citations to the sources of its data.

such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activity, or

 (B) in commercial activity or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable to a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125. Most claims under the Lanham Act fall into two broad categories, claims of false designation of origin and false advertising claims. The present claim could be framed as falling into either category. Because the parties have treated it as a claim of false designation of origin, however, the court will treat it in that fashion. (Swift Brothers' name was not registered as a trade name or trademark; however, neither the Lanham Act claims nor the state-law claims require a trade name to be so registered.)

█ The defendants dispute only one element of the plaintiff's case under the Lanham Act, that of "secondary meaning." A brief digression is necessary in order to describe the nature of this element. The courts have divided designations of origin into four categories: (1) those that are "arbitrary," so named because they bear no logical relationship to the characteristics of the goods with which they are associated; (2) those that are "suggestive," so named because they suggest those goods' characteristics; (3) those that are "descriptive," so named because they describe the characteristics of the goods in question directly; and (4) those that are "generic," "which function as the common descriptive name of a product class." *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3rd Cir.1986). Names such as "Swift Brothers" fall into the category of descriptive marks, as they describe the association of a particular individual (or individuals) with the firm described. *See Yarmuth–Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir.1987). Descriptive marks are only protected from infringement if they have acquired "secondary meaning," that is, if they have been used for such a long time, or so widely, that they are closely associated in the public mind with the particular product (and manufacturer) in question.

It follows, then, that Swift Brothers must show that its name has acquired secondary meaning in order to bring a Lanham Act claim. In determining whether a name has acquired secondary meaning, "[a] non-exclusive list of factors which may be considered includes the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the size of the company, the number of sales, the number of customers, and actual confusion." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277 (3rd Cir.1991). The existence of secondary meaning is a question of fact. *See Dranoff–Perlstein Associates v. Sklar*, 967 F.2d 852, 862 (3rd Cir.1992).

█ Swift Brothers has presented enough evidence to avoid summary judgment as to the question of secondary meaning. By 1984, Swift Brothers had operated under that name for over twenty years, suggesting that its name was well-established. Swift Brothers alleges in its complaint that, since 1963, it had spent "approximately $411,772.79 promoting and advertising the trade name 'Swift Brothers' and the Swift marks in various media including newspapers, magazines, and telephone directories." Complaint, ¶ 14. (Swift Brothers has not provided any documentation of this claim, perhaps because of the continued illness of James Swift cited by plaintiff's counsel elsewhere in his brief. However, the specificity of this claim suggests that Swift Brothers has records to support this allegation, and hence plaintiff will be granted a reasonable time to do so.) Swift Brothers also provides the testimony of a Swift Brothers customer, William Schrope, who clearly recognized the Swift Brothers name, distinguished it from Swift and Sons' trade name, and preferred Swift Brothers' services. Finally, the very fact that Swift and Sons found it helpful to use Swift Brothers' name in its advertising materials is in itself evidence that the name has acquired secondary meaning. *See Harlequin Enter-*

*prises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 950 (2nd Cir.1981).

## 2. *Economic Tort Claims*

Of the economic tort claims made by Swift Brothers, only two, the claims of unfair competition and of injury to business reputation, are relevant to the advertisement in the *Chestnut Hill Local.* Indeed, a claim of injury to business reputation, also called commercial disparagement, is a species of unfair competition claim. *See* Andrew L. Lee, *Unfair Competition and Trade Practices, in* 17 *Summary of Pennsylvania Jurisprudence 2d* § 18 at 12 (1994). The plaintiff may also be able to make a claim of misrepresentation of product origin, another form of unfair competition claim, based upon the *Chestnut Hill Local* advertisement. *See id.* at 16–22. Broadly speaking, the two claims differ in that a claim of commercial disparagement emphasizes the direct harm to the plaintiff's reputation (and hence sales) caused by the alleged false statement, while in a claim of misrepresentation the harm to the plaintiff's sales is indirect, and results from the fact that a competitor's sales have been enhanced by allegedly false statements.

▮▮▮ As to the claim for commercial disparagement, Judge Luongo a number of years ago concisely described the elements of this tort: "The publication of a disparaging statement concerning the product of another is actionable where (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its falsity." *Zerpol Corp. v. DMP Corp.,* 561 F.Supp. 404, 409 (E.D.Pa.1983). The defendants have not challenged the existence of any of these elements. However, the court notes that Pennsylvania law requires that a plaintiff claiming commercial disparagement plead damages with considerable specificity. Under this rule, the plaintiff "must in his complaint set out the names of his lost customers and show by figures how much he has lost financially," *Testing Systems, Inc. v. Magnaflux Corpora-*

*tion,* 251 F.Supp. 286, 290 (E.D.Pa.1966) (quoting *Cosgrove Studio & Camera Shop v. Pane,* 21 Pa.D. & C.2d 89 (1960), *rev'd on other grounds* 408 Pa. 314, 182 A.2d 751 (1962)), a burden that Judge Luongo rightly described as "near impossible." *Zerpol,* 561 F.Supp. at 409. Swift Brothers' complaint does not allege the customers it lost as a result of the *Chestnut Hill Local* advertisement; the court will, therefore, grant it a reasonable period in which to do so, and, if it does not, will dismiss this element of the complaint.

▮▮▮ As to the misrepresentation of product origin claim, however, there is no requirement to plead damages with specificity. In order to recover on such a claim, a plaintiff must demonstrate that "there was a probability or likelihood of confusion in the customers' mind[s] as to the source or origin of the product sold by the defendants." *International Election Systems Corp. v. Shoup,* 452 F.Supp. 684, 710 (E.D.Pa.1978). This entails demonstrating that customers desire a product made by the plaintiff, rather than merely desiring the product itself, and that the confusion is "as to the origin of the product, not as to the goods." *Id.* Swift Brothers asserts that it expended considerable effort in advertising its products and that it had great name recognition in its markets, claims that the defendants apparently do not dispute; moreover, a fact-finder might well conclude that the alleged advertisement could confuse a customer as to the origin of Swift and Sons' product. This showing suffices to preclude a grant of summary judgment.

## 3. *54 Pa.C.S.A. § 1124 Claim*

The complaint also contains a claim under 54 Pa.C.S.A. § 1124. That statute provides for injunctive relief in cases of "injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter." *Id.* Although the complaint originally sought to enjoin the defendants from using the name "Swift and Sons," the plaintiff has not pressed this claim, and there is no indication that any injunction is warranted. Therefore, this element of the complaint will be dismissed.

## B. Oral Statements of the Defendants to Swift Brothers Clients

 Swift Brothers alleges that Robert Swift, Sr. or his associates told customers that James Swift had retired or moved to Chicago and that Swift Brothers was no longer in existence. The only evidence that Swift Brothers provides to that effect, however, is James Swift's own testimony that he was approached by acquaintances who told them that Robert Swift had made those statements to them. As the defendants point out, this evidence is hearsay, and not admissible. It therefore cannot be considered on a motion for summary judgment. *See* Charles A. Wright, Arthur R. Miller and Mary Kay Kane, 10A *Federal Practice and Procedure* § 2722 at 49–50 (1983).

Swift Brothers does cite some former Swift Brothers customers who became customers of Swift and Sons following the partnership's dissolution, but does not provide any evidence that any improper post-dissolution conduct of the defendants induced them to become Swift and Sons' customers. Thus, the defendants' motion for summary judgment will be granted as to all claims based upon alleged post-dissolution oral statements by the defendants.

## C. Alleged Communication of Swift Brothers' Customer Information to Defendants

Swift Brothers' last claim is based upon an incident in 1989, in which Michael Moore, an employee of Swift Brothers, claims that he overheard Alan Swift, a brother of James and Robert Swift, giving customer information over the telephone to someone named "Bob" while sitting at James's office desk. Affidavit of Michael Moore, Plaintiff's Exhibits at 55. Swift Brothers makes a claim of misappropriation of trade secrets on the basis of this incident.

 Customer lists have long been protected as trade secrets under Pennsylvania law. *See Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838, 842 (1957). In order to be so protected, the lists must not be made up of information that can readily be assembled by other means.

*See BIEC Intern., Inc. v. Global Steel Services, Ltd.*, 791 F.Supp. 489, 545 (E.D.Pa. 1992). The plaintiff must also demonstrate that it has taken "reasonable precautions under the circumstances" to maintain the secrecy of the trade secret in question. *Anaconda Company v. Metric Tool & Die Company*, 485 F.Supp. 410, 422 (E.D.Pa.1980). The defendants assert that the plaintiff had no confidentiality agreements with its employees to protect its customer information. Such agreements are not necessary in every case, however, if the other precautions taken by the plaintiff are sufficient. The plaintiff has not yet made clear the precise nature and extent of its efforts to protect its trade secrets. This is understandable, however, as the defendants have not put that question at issue. Thus, summary judgment will not be granted as to this claim.

## IV. Robert Swift, Jr. as a Party

The defendants also assert that Robert Swift, Jr. should be dismissed as a party. They are almost entirely correct. The accounting claim is not relevant to Robert Swift, Jr., as he was not a partner in Swift Brothers, and as the plaintiff has not presented any facts suggesting that he played an active role in diverting business or profits from the partnership. Nor are the *Chestnut Hill Local* claims of any relevance to him. However, there is, presumably, some possibility that Robert Swift, Jr. is the "Bob" to whom, according to Michael Moore, Alan Swift was overheard divulging customer information over the telephone (Plaintiff's Exhibits at 55), a disclosure alleged to constitute misappropriation of trade secrets. Thus, for purposes of the resolution of this one issue, Robert Swift, Jr. will not be dismissed as a defendant in this case.

## V. Conclusion

In conclusion, then, it may be useful to describe the claims remaining in this case. One broad group of claims relates to the events up to and including the dissolution of Swift Brothers. These claims are subsumed within a single action for an accounting, although they include breach of fiduciary duty claims. Swift Brothers also has an outstand-

ing Lanham Act claim, a claim of commercial disparagement, and a claim of misrepresentation (all based upon the advertisement in the *Chestnut Hill Local*) and a claim of misappropriation of trade secrets based upon the alleged conduct of Alan Swift. Summary judgment will be granted as to all other claims in this case.

An appropriate order follows.